**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| **R.Y.M.R. and Eric Matute Castro,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **United States of America,** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

Plaintiffs R.Y.M.R.[1] and his father, Eric Matute Castro ("Mr. Matute"), by their attorneys, bring this complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), and under state law, stating as follows:

## INTRODUCTION

1.      This matter concerns a barbaric policy issued at the highest levels of the federal government to separate asylum-seeking parents from their children. The government's policy of forcibly taking children from their parents caused extraordinary trauma to thousands of families, including the Plaintiffs—a father and his son – who were 33 and 3 years old respectively when, under threat of violence, they were torn apart and separated for months. The trauma suffered by this boy and his father was no incidental byproduct of the policy. Indeed, it was the very point. In

---

[1] Because Plaintiff R.Y.M.R. is a minor child, his initials are used to protect his privacy.

using this brutal intimidation tactic, the government sought to inflict emotional distress in order to deter parents and children from seeking asylum in this country.

2.      Executive branch officials intended to use the trauma resulting from family separations, and the consequent media reporting about that trauma, to deter future asylum seekers. Federal officials at the highest levels made no secret of the purpose of this policy and, in fact, made repeated public statements acknowledging the policy's purpose.

3.      In total, the government has acknowledged that between July 2017 and June 2018 it separated at least 3,845 children from their parents or guardians after they crossed the southwestern U.S. border.[2] Additional government reporting indicates that the number of families separated likely is much higher.[3]

4.      After forcibly taking children from their parents, the government inflicted further trauma when it delayed providing information to parents and children of each other's whereabouts or well-being, failed to facilitate adequate communication between the parents and children during their separation, and failed to implement any system for tracking the children to ensure that the families could be reunited.

5.      The Plaintiffs in this action fell victim to the Administration's policy in 2017, when federal officers forcibly separated them. The child, R.Y.M.R., was designated an "unaccompanied minor" and transferred to the custody of the Office of Refugee Resettlement ("ORR") to a juvenile

---

[2] Joint Status Report at 1, 10, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18-cv-00428 DMS MDD (S.D. Cal. Jan. 15, 2020), ECF No. 511 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has so far acknowledged an additional 1,030 children separated from the expanded class members).

[3] *See* Office of the Inspector General, U.S. Dep't of Health & Human Servs., Oei-BL-18-00511, *Separated Children Placed in Office of Refugee Resettlement Care* at 1, 6, 13 (Jan. 17. 2019)(reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *Ms. L.*]").

shelter in San Antonio, Texas. Mr. Matute was later transferred to the custody of Immigration and Customs Enforcement ("ICE") at Otay Mesa Detention Center in San Diego.

6.      Though Mr. Matute tried to locate and contact R.Y.M.R,  the government provided no information to Mr. Matute about R.Y.M.R.'s whereabouts, and he had no communication whatsoever with his son for nearly 75 days. As a result of the government's actions, the Plaintiffs suffered, and continue to suffer, substantial and ongoing trauma.

7.      These policies have profound adverse health implications for adults and children and violate basic human rights, including the right to be free from torture and enforced disappearance and the right to family integrity.

8.      The government's family separation policy was cruel and inhumane, and it was unlawful. The United States is liable for the conduct which harmed Plaintiffs under the FTCA, 28 U.S.C. §§ 1346(b)(1) and 2671-2680.

9.      Plaintiffs bring this action under the FTCA seeking compensation for the extraordinary harms they suffered at the hands of the federal government.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 2674, 1331, and 1346(b).

11.     On November 14, 2019, Plaintiff submitted an administrative claim to the U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), ICE, and the U.S. Department of Health and Human Services ("HHS"). There has been no final disposition of the Plaintiff's administrative claim and, as six months have passed since the submission of their claim, it is deemed finally denied. 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all potential administrative remedies.

12.     Venue is proper in this District under 28 U.S.C. § 1402 (b) because Mr. Matute and R.Y.M.R. reside in this district.

## PARTIES

13.     Eric Matute Castro is the father of R.Y.M.R. and is a 35-year-old asylum seeker from Honduras.

14.     Plaintiff, R.Y.M.R., now six years old, is the son of Mr. Matute. They have been residing in Florida since January of 2018.

15.     Defendant United States of America is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b), 2671, *et seq.*

16.     All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies.

## STATEMENT OF FACTS

### A. The Family Separation Policy Was Developed to Deter Future Asylum Seekers

17.     Curbing the number of individuals seeking asylum in the United States has been a central focus of the Trump Administration's immigration policy.[4]

---

[4]*See, e.g.*, *U.S. Judge Bars Trump Administration from Enforcing Asylum Ban*, CNBC, Nov. 20, 2018, https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban. html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU, Oct. 30, 2018, https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH. POST, Aug. 17, 2019, https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration/; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE, July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Maria Sacchetti, Felicia Sonmez & Nick Miroff, *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH. POST, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum -cases/2019/04/29/df41b5f2-6adb-11e9-be3a33217240a539_story.html; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES, Jan. 24, 2019

18.     To that end, in July 2017, the government established a family separation pilot program in CBP's El Paso sector, through which it targeted for criminal prosecution parents who crossed the border with children. It detained the parents and forcibly took their children away from them, designated the children as unaccompanied minors (despite their having arrived with their parents), and placed the children in the custody of ORR, a component of HHS. Through this initiative, the government separated 281 individuals in families between July and November 2017.

19.     By late 2017, the government was separating families along the length of the U.S.-Mexico border, including families arriving through official ports of entry.[5]

20.     In December 2017, senior officials at the Department of Justice and DHS exchanged a memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration."[6] Two of the policies outlined in the memorandum were titled: "Increased Prosecution of Family Unit Parents" and "Separate Family Units." Under the prosecution policy, the memorandum stated that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied alien children]." The memorandum asserted that "the increase in prosecutions would be reported by media and it would have substantial deterrent effect."[7]

---

https://www.nytimes.com/2019/01/24/us/politics/migrants- blocked-asylum-trump.html; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum Claims*, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claims-idUSKCN1ND35K.

[5] *See Ms. L. v. U.S. Immigrations and Customs Enf't*, 310 F. Supp. 3d 1133, 1142-45, 1149 (S.D. Cal. 2018), *modified* 330 F.R.D. 284 (S.D. Cal. 2019).

[6] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html (hereinafter "Policy Options"); *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC NEWS, Jan. 17, 2019,https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting-migrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).

[7] *See id*.

21.     On April 6, 2018, then Attorney General Jeff Sessions announced that the government would institute a "Zero Tolerance" policy, mandating the prosecution of all persons who crossed the United States border between ports of entry, thereby extending to the entire southern border the practices of criminal prosecution and family separation previously tested in the El Paso pilot program.[8] Consistent with its announcement, the Administration promptly began separating families along the entire border.

22.     The purpose of this policy was to deter individuals from seeking asylum or otherwise coming to the United States. The Administration intended to deter immigration by harming families through the forcible separation of parents and children.[9]

23.     The Administration knew that separation would cause enormous trauma to the children and parents. Indeed, the Administration intended that publicity concerning the trauma suffered by asylum seekers would deter other would-be asylum seekers from seeking refuge in the United States for fear of suffering the same fate. Administration officials at the highest levels thus planned and implemented a policy of separating families both knowing that the policy would cause severe harm to the people it affected and specifically intending that it would cause such harm.[10] For example:

a.      In September 2016, the DHS Advisory Committee on Family Residential Centers issued a report that concluded that "[t]he best interests of the child should be

---

[8] *Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry*, DEP'T OF JUSTICE (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal -illegal-entry.

[9] *See 60 Minutes, Chaos on the Border, Robots to the Rescue, To Kill a Mockingbird* (CBS Television Broadcast Nov. 25, 2018) (revealing an un-redacted copy of the memo implementing the "Zero Tolerance" policy that stated that the policy's purpose was deterrence); *see also* Policy Options, *supra* note 7.

[10] Policy Options, *supra* note 7; *see also* Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Wash. Post, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials- who-have-said-that-family-separation-is-meant-as-a-deterrent/.

paramount in all custody decisions regarding family members apprehended by DHS," and warned that "separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[11]

      b.     Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the policy that separating children from their parents would likely harm the children, including "significant potential for traumatic psychological injury to the child."[12] Administration officials ignored Commander White's warnings up through the day he left ORR (on March 15, 2018), just weeks before the policy was launched across the entire southern border and continued to disregard his warnings thereafter.

      c.     In March 2017, several DHS officials told the press that the department was considering a policy of separating mothers and children who cross the border illegally in order to deter families from migrating to the United States.[13] The day after the press report, the American Academy of Pediatrics responded with a statement opposing DHS's proposed family separation program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States

---

[11] U.S. Immigration & Customs Enf't, Dep't of Homeland Sec., Rep. of the DHS Advisory Committee on Family Residential Centers 2 (2016), *available at* https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[12] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html; *see also Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce, 116th Cong.* (Feb. 7, 2019) (testimony of Commander Jonathan White).

[13] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border,* Reuters (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-children-idUSKBN16A2ES.

is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers. Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive. We urge policymakers to always be mindful that these are vulnerable, scared child.[14]

24.     Despite the dire warnings about the effects of this policy, numerous high-level officials publicly admitted that family separation was the express policy and that the purpose of the policy was to harm asylum seekers arriving in the United States so as to deter future asylum seekers. For instance: When asked about the policy by NPR on May 11, 2018, John Kelly, President Trump's then-Chief of Staff, responded that "a big name of the game is deterrence. It could be a tough deterrent."[15] As for the children affected, he said: "[t]he children will be taken care of — put into foster care or whatever."[16]

25.     On June 18, 2018, on Fox News's "The Ingraham Angle," host Laura Ingraham asked then-Attorney General Jeff Sessions, "is this policy in part used as a deterrent? Are you trying to deter people from bringing children or minors across this dangerous journey? Is that part of what the separation is about?" Sessions replied, "I see that the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration. So yes, hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."[17]

---

[14] Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.asp.

[15] *See Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[16] *Id.* (emphasis added).

[17] Philip Bump, *Here are the Administration Officials Who Have Said that Family Separation is Meant as a Deterrent*, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

26.     On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, told reporters that "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[18]

27.     Accordingly, from 2017 through the time period at issue in this Complaint, senior government officials made the express choice to intentionally cause parents and children, including very small children like R.Y.M.R., extraordinary pain and suffering in order to accomplish their policy objectives.

28.     A recent Physicians for Human Rights (PHR) investigation, based on psychological evaluations of asylum-seeking parents and children who were separated by the U.S. government in 2018, found pervasive symptoms and behaviors consistent with trauma; most family members met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of family separation.[19] Significantly, PHR finds that the U.S. government's treatment of asylum seekers through its policy of family separation constitutes cruel, inhuman, and degrading treatment and, in all cases evaluated by PHR experts, rises to the level of torture.[20]

29.     Family unity is a fundamental principle of child welfare law and recognizes that in order to thrive, children must remain in the care of their families where they are loved, nurtured, and feel safe. As such, the separation of Plaintiff from his father violated Plaintiff's constitutional

---

[18] *Id.*

[19] PHR Report at 22.

[20] As defined by the United Nations Convention Against Torture, torture is an act 1) which causes severe physical or mental suffering, 2) done intentionally, 3) for the purpose of coercion, punishment, intimidation, or for a discriminatory reason, 4) by a state official or with state consent or acquiescence. In the cases that PHR documented, U.S. officials intentionally carried out actions causing severe pain and suffering, in order to punish, coerce, and intimidate Central American asylum seekers to give up their asylum claims, in a discriminatory manner. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, 113; S. Treaty Doc. No. 100-20 (1988).

right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, *see, e.g., Quilloin v. Walcott*, 434 U.S. 246, (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is constitutionally important for children to remain with their parents, *see Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligation the state can neither supply nor hinder.").

30.     ICE and CBP have well-established legal obligations to ensure the prompt release of minors in their custody and to favor preserving family unity whenever possible.  *See Flores v. Reno*, CV 85-cv-4544, ECF. No. 177 (C.D. Cal. July 24, 2015); 8 C.F.R. § 1236.3. The *Flores* consent decree remains binding on the United States and significantly limits the circumstances, duration, and manner of immigration detention of minor children.

31.     The *Flores* consent decree imposes standards for the treatment of detained minors and recognizes their vulnerability of being detained without a parent or guardian. It requires, among other matters, that immigration officers permit minors contact with family members who were arrested with the minor. DHS and its agents violated its obligations under the *Flores* consent decree and 8 C.F.R. § 1236.3 by not prioritizing family unity and instead needlessly separating Plaintiff from his father.

**B. The Implementation of the Separation Policy and the Chaos of Reunification[21]**

32.     CBP officers generally carried out separations of parents and children under the family separation policy at various immigration detention sites near the southwestern border.

---

[21] The paragraphs in this section are based on the citations previously set forth in this Complaint, as well as those included herein, as well as information and belief.

33.     Immigration officials frequently put arriving parents and children in cells in short-term detention centers and told the parents that immigration officials would take their children.

34.     Immigration officials often told parents that they committed a crime by crossing the border, regardless of the circumstances of their entry.

35.     Many parents waited in terror as they watched immigration officials take children from their parents, knowing that their children's names might soon be called.

36.     If the parents did not willingly hand their children over to immigration officials, the officials often forcibly ripped the children out of their parents' arms.

37.     Immigration officials separated children as young as infants and children as old as 17 from their parents, without regard to age or language ability.

38.     In many cases, parents begged immigration officials not to take their children, but immigration officials did so, often with callous disregard for the parents' and children's anguish. After forcibly separating family units, CBP transferred many parents into ICE custody.

39.     Many parents watched immigration officials separate other parents and children after they were separated from their own children, compounding the trauma.

40.     In many cases, immigration officials flew children thousands of miles away from their parents under the pretense that the separation was the necessary result of the criminal prosecution of the parents. In an effort to create maximum chaos and harm, the government took the children regardless of whether their parents were taken into criminal custody, remained in criminal custody for any length of time, or were even prosecuted at all.

41.     After forcibly separating family units, CBP transferred many parents into ICE custody.[22]

42.     As predicted by then- Secretary John Kelly, ORR staff then placed the children in "foster care or whatever."  The "whatever" included placement of many children in ORR facilities throughout the United States.

43.     When the children were separated, the government classified them as "unaccompanied," even though they had been accompanied by their parents when they arrived in the United States seeking asylum and remained accompanied until the government separated them from their parents and transferred the children to ORR custody. ORR is responsible for the long-term custodial care and placement of "unaccompanied alien children." See 6 U.S.C. § 279(a).

44.     Parents suffered physically, mentally, and/or emotionally during the separation from their children.

45.     Likewise, children separated from their parents suffered physically, mentally, and/or emotionally. This trauma was aggravated by the fact that many children did not understand why they had been separated and some believed their parents had abandoned them.[23]

46.     Serious psychological harm to children and families was a foreseeable result of Department of Homeland Security's implementation of the forced family separation policy.

---

[22] Office of The Inspector General, U.S. Dep't Of Homeland Security, OIG- 18-84, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 2-3, 13, 15 (Sept. 27, 2018) [Hereinafter DHS OIG Report].

[23] Office of the Inspector General, U.S. Dep't Of Health & Human Servs., Oei-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 10 (Sept. 2019) [hereinafter "HHS OIG Report II"] ("Children who did not understand why they were separated from their parents suffered elevated levels of mental distress. For example, program directors and mental health clinicians reported that children who believed their parents had abandoned them were angry and confused.").

47.     It was within the government's power to prevent separation through use of alternatives to detention, to reduce the duration of separation through a reunification plan, and to ensure timely information about the wellbeing, whereabouts, and contact information for children and parents by setting up appropriate information and communications channels.

48.     Instead, the U.S. government took no reasonable measures to minimize the predictable psychological harms which resulted from its policy to separate parents and children. In many cases, individuals employed by the U.S. government similarly did not take additional measures to prevent these harms.

49.     The government's failure to utilize proper record keeping of the separated families led to more chaos.  As emphasized by the Honorable Dana M. Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy, the agencies' failure to coordinate tracking of separated families was a "startling reality" given that: "[t]he government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels—state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as property. Certainly, that cannot satisfy the requirements of due process." *See Ms. L. v. U.S Immigration & Customs Enf't ("ICE"),* 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), and *enforcement granted in part, denied in part sub nom. Ms. L. v. U.S. Immigration & Customs Enf't*, 415 F. Supp. 3d 980 (S.D. Cal. 2020).

50.     On June 26, 2018, in *Ms. L*, Judge Sabraw ordered the government to reunify families. The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the future, absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days. *Id.* at 1149.

51.     Judge Sabraw criticized the agencies for their callous treatment of families: "[W]hat was lost in the process was the family. The parents didn't know where the children were, and the children didn't know where the parents were. And the government didn't know, either."[24] Judge Sabraw found that the government's family separation violated the constitutional right to family integrity.[25]

52.     As evidenced by Administration officials' statements that the policy's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do so, the government instituted and implemented this policy to intentionally inflict emotional distress on

---

[24] Transcript of Status Conference at 58, *Ms. L.*, No. 18-cv-00428 DMS MDD (S.D. Cal. July 27, 2018), ECF No. 164.

[25] *See Ms. L. v. U.S Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 1161-1167 (S.D. Cal. 2018 (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *see also Smith* v. *Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

the parents and children whom it separated. It succeeded, with devastating consequences for Plaintiffs.

**C. Mr. Matute and R.Y.M.R.**

53.     Eric Edgardo Matute Castro ("Mr. Matute"), is a 35-year-old man and R.Y.M.R. is his 6-year-old son. Both are from Barrio Buenos Aires, Juticalpa, Olancho, Honduras.

54.     Mr. Matute and R.Y.M.R. fled Honduras in late 2017 after they received death threats from members of a transnational criminal family who had killed Mr. Matute's family members.

55.     They crossed the Southern Border into the U. S. on approximately November 13, 2017 and were apprehended by CBP and transported to Chula Vista CBP Station in California.

**D. Conditions in CBP Custody on the Border**

56.     Upon arriving to Chula Vista Station, Mr. Matute and R.Y.M.R. were placed in a room with "Officer Nathan." Over the course of the next few hours R.Y.M.R. requested to use the restroom several times.

57.     The third time Mr. Matute requested for R.Y.M.R. to use the restroom, Officer Nathan became visibly upset, yelling in English, slamming his hand on a table, and throwing a pen. While Mr. Matute does not speak much English, he did understand when Officer Nathan yelled "Shut up motherf*****!" at R.Y.M.R. Because the child was not allowed to use the restroom, he was ultimately forced to urinate in his pants. R.Y.M.R. remained in those same urine-soaked clothes for at least 4 days – the remainder of the time he was in CBP custody.

58.     When Officers at Chula Vista observed that Mr. Matute was suffering from a cold, instead of offering him medical attention, they forced Mr. Matute to wear a mask that made it

harder for him to breathe. The officer pinched the metal clip on the nose extremely hard causing him pain.

59.     Because Mr. Matute was detained in a room with Officer Nathan, who had been aggressive toward him earlier in the day, Mr. Matute did not feel that he was free to remove the mask, even though it was very uncomfortable. Mr. Matute later requested to make a phone call to his friend who would sponsor him in his release from detention, but Officer Nathan denied this request.

60.     After the initial intake process, Mr. Matute and R.Y.M.R. were moved to a room with several other detainees. Officers later moved them to a room called the "hielera" (i.e. a room kept at freezing cold temperatures). After several hours, officers moved the pair to a smaller room, and then later back to Officer Nathan's office. These constant movements prevented Mr. Matute and R.Y.M.R. from much needed sleep after their long journey. Finally, officers moved father and son from Officer Nathan's office to a small room for the remainder of the night.

61.     From Tuesday, November 14th through Thursday, November 16th, Mr. Matute and R.Y.M.R. were shuttled back and forth between different buildings at Chula Vista and a nearby motel approximately 20 to 30 minutes away where they were housed with other fathers and sons.

**E. Separation of Mr. Matute and R.Y.M.R.**

62.     On Thursday morning, November 16th, officers transported Mr. Matute and R.Y.M.R. back to the same large building. On this date, Mr. Matute and other fathers with whom he was detained, along with their children, had several disturbing encounters with immigration officers.  In one encounter, the fathers were approached by a guard and advised that they would be required to relinquish custody of their children, and that the children would be transported to a

shelter. Mr. Matute asked why they were being separated from their children, and the officer responded that the fathers and children could not be detained together.

63.     Later that day, one of the officers directed the fathers to separate their children's belongings from their own because they would soon be separated. The officer said directly to Mr. Matute, "Give your kid to us", to which Mr. Matute objected, "No, I am not going to do that." Another father then asked to make a phone call to a legal aid organization, but he was advised that the fathers had no right to make a phone call, stating to him that "no one can help you anyway." The officers warned that they were going to take the children regardless of the fathers' stated wishes and that the refusal to comply would negatively impact the families' asylum cases. That same father again requested to make a phone call to a legal aid organization, which was denied. All four fathers continued to resist giving up their children, and the officers left.

64.     The officers returned, this time with an officer who identified himself as the officer-in-charge. Mr. Matute continued to object to being separated from R.Y.M.R. The officer replied Mr. Matute, "Do you want me to take him by force?" Mr. Matute responded that he did not want that to occur and explained that he only wished to remain together with his child. Mr. Matute pleaded with the officer to think of the situation from his perspective and asked whether the officer would so easily let go of his son if he were in Mr. Matute's position. The officer-in-charge stated that he understood, but that he had to follow the orders to take the children, and that these orders come from above.

65.     Mr. Matute again repeated that he would not relinquish custody of his child. The officer-in-charge replied, "Well if you want violence, then you'll have it."

66.     One officer removed his taser from its holsters while another officer threatened Mr. Matute with pepper spray.

67.     Mr. Matute pleaded with the officer not to take his son. One of the other detained fathers tried to calm Mr. Matute, who at this point, was becoming frantic at the thought of separation from R.Y.M.R.

68.     Despite the fathers' protests and pleas, while the fathers, including Mr. Matute, were still under imminent threat of the violent use of tasers and pepper spray, several officers arrived and took the children away by force.

69.     R.Y.M.R. cried and begged to remain with his father, wrapping his arms around his neck. Mr. Matute held R.Y.M.R. firmly in his arms and repeated to the officers that he would not allow them to take his child.

70.     Finally, an officer pried R.Y.M.R. from Mr. Matute's arms. While being wrestled away from his father, R.Y.M.R. cried and screamed "Papi! Papi!"

71.     Throughout this ordeal, no one provided any paperwork for Mr. Matute to review or sign in connection with his separation from R.Y.M.R. Moreover, when Mr. Matute asked why the fathers and children were being separated, the officer-in-charge stated that transferring the fathers to a facility that could house fathers together with their children was "too complicated."

72.     The above described events, in which R.Y.M.R. was pried from his father's arms, occurred on or about November 17, 2017.  Shortly thereafter, R.Y.M.R. was transferred to the custody of ORR and to a juvenile shelter in San Antonio, Texas.

73.     Federal officers had no reason to believe that Plaintiff's father was an unfit parent, and in separating Plaintiff from his father, then confining him in a shelter for more than a month, the government violated its non-discretionary obligation to maintain family integrity.

74.     Not only did Mr. Matute endeavor to locate and contact R.Y.M.R., the boy's mother, as well as an attorney, tried to facilitate contact between father and son.  Nonetheless, the

government provided no information to Mr. Matute about R.Y.M.R.'s whereabouts, and he had no communication whatsoever with his son while they were detained.

75.     Furthermore, under long-standing legal obligations, imposed by regulations and by consent decree, the federal officers who took custody of Plaintiff violated multiple non-discretionary duties that were designed to protect families, and particularly children. Among other things, those non-discretionary obligations impose a duty on federal officers not to separate immigrant families that are arrested together, to prioritize release of minors to family members over shelters, to allow detained children to have contact with family members who were arrested with them, and to ensure prompt release of minors held in immigration custody. In its treatment of Plaintiffs, the government violated all of these obligations.

76.     Mr. Matute was later transferred to the custody of ICE at Otay Mesa Detention Center in San Diego. While he was detained at Otay Mesa, ICE officers visited Mr. Matute to ask him for the contact information of family members that would be able to care for R.Y.M.R. upon his release from ORR custody. After providing the officers with his family's phone numbers, Mr. Matute asked the ICE officials for information about R.Y.M.R.'s whereabouts and condition and was told that they were not able to release any information to him about his son.

77.     Mr. Matute was eventually released from ICE custody, on his own recognizance, on or about January 15, 2018 to Jacksonville, Florida, where he lived with a friend for approximately two weeks. On or about January 29, 2018, Mr. Matute and R.Y.M.R. were reunited in Miami after roughly 73 days apart.

78.     The egregious deprivations of basic human rights that Plaintiff R.Y.M.R. experienced while in U.S. custody, the forced separation from his father, and the subsequent

detention in a juvenile shelter all constitute negligence and intentional infliction of emotional distress caused by government officers and supervisors.

79.     Plaintiffs' detention and separation violated the U.S. Constitution's clearly established due process rights governing immigration detainees and the right to family integrity. As such, this tortious conduct is not subject to the FTCA's discretionary function exception, or any other such exception.

80.     The government's tortious conduct caused Plaintiffs to suffer substantial damages, including physical pain and suffering, mental and emotional pain and anguish, and other losses that continue today.

**CLAIMS FOR RELIEF**
**COUNT I**
**BATTERY**

81.     Plaintiffs reallege the allegations in paragraphs 1-80 as if they were fully alleged herein.

82.     Despite the fathers' protests and pleas, while the fathers, including Mr. Matute, were still under imminent threat of the violent use of tasers and pepper spray, several officers arrived and took the children away by force.

83.     R.Y.M.R. cried and begged to remain with his father, wrapping his arms around his neck. Mr. Matute held R.Y.M.R. firmly in his arms and repeated to the officers that he would not allow them to take his child.

84.      Finally, an officer pried R.Y.M.R. from Mr. Matute's arms. While being wrestled away from his father, R.Y.M.R. cried and screamed "Papi! Papi!"

85.     Through the actions described *supra* ¶¶68-70, the federal employees referenced *supra* intentionally and offensively touched both Mr. Matute and R.Y.M.R. and used unreasonable force to separate Mr. Matute and R.Y.M.R.

86.     Neither Mr. Matute nor R.Y.M.R. consented to this touching.

87.     Defendant's use of unreasonable force caused injury, damage, loss and harm to both Mr. Matute and R.Y.M.R.

88.     As a direct and proximate result of the battery, Plaintiffs suffered substantial damages.

89.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for battery.

## COUNT II
## ASSAULT

90.     Plaintiffs reallege the allegations in paragraphs 1-80 as if they were fully alleged herein.

91.     Despite the fathers' protests and pleas, while the fathers, including Mr. Matute, were still under imminent threat of the violent use of tasers and pepper spray, several officers arrived and took the children away by force.

92.     R.Y.M.R. cried and begged to remain with his father, wrapping his arms around his neck. Mr. Matute held R.Y.M.R. firmly in his arms and repeated to the officers that he would not allow them to take his child.

93.      Finally, an officer pried R.Y.M.R. from Mr. Matute's arms. While being wrestled away from his father, R.Y.M.R. cried and screamed "Papi! Papi!"

94.    Through the actions described *supra,* the referenced federal employees unequivocally threatened to violently inflict immediate injury on Mr. Matute and R.Y.M.R. who were then present.

95.    These employees fully intended to cause and place Mr. Matute and his son in grave apprehension of immediate, harmful, and offensive contacts with their persons.

96.    Mr. Matute and R.Y.M.R. were reasonably in fear of the grave harm threatened and did not consent to the threats or the conduct of these employees of the United States.

97.    Defendant's conduct caused damage, loss and harm to both Mr. Matute and R.Y.M.R.

98.    As a direct and proximate result of this unequivocally threatening conduct, Plaintiffs suffered substantial damages.

99.    Under the Federal Tort Claims Act, the United states is liable to Plaintiffs for assault.

## COUNT III
## NEGLIGENCE

100.    Plaintiffs reallege the allegations in paragraphs 1-80 as if they were fully alleged herein.

101.    The federal employees referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause unnecessary harm or injury to Plaintiffs.

102.    By engaging in the acts alleged herein, these federal employees failed to act with ordinary care and breached the duty of care owed to Plaintiffs.

103.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

104.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

105.    Plaintiffs reallege the allegations in paragraphs 1-80 as if they were fully alleged herein.

106.    The violent separation of parent and child, followed by nearly seventy-five (75) days in which father and son had no contact, despite Mr. Matute's efforts (*supra* at ¶¶70-74), caused Mr. Matute and R.Y.M.R severe emotional distress of such substantial and enduring quality that no reasonable person should be expected to endure it.

107.    By engaging in the acts described, the federal employees engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

108.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

109.    Under the Federal Tort Claims Act, the United states is liable to Plaintiffs for intentional infliction of emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, Mr. Matute and R.Y.M.R. respectfully request:

A.  Compensatory damages;

B.  Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.  Such other and further relief as the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED** this 28th day of August 2020.

s/Jennifer Coberly
Jennifer Coberly
Florida Bar No. 930466
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36 Street, Suite 2201
Miami, FL 33166
Phone: (305) 573-1106 Ext. 1995
Fax: (305) 576-6273
E-mail jcoberly@aijustice.org

/s/ Robert Parks
Robert Parks
Florida Bar No. 61436
799 Brickell Plaza, Suite 900
Miami, Florida 33131
Tel: (305) 445-4430
Fax: (305) 445-4431
E-mail BParks@rlplegal.com

s/ Lisa Lehner
Lisa Lehner
Florida Bar No. 382191
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36 Street, Suite 2201
Miami, FL 33166
Phone: (305) 573-1106 Ext. 1020
Fax: (305) 576-6273
E-mail llehner@aijustice.org