| CLAIM FOR DAMAGE, INJURY, OR DEATH | **INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| U.S. Department of Homeland Security<br>U.S. Customs and Border Patrol<br>U.S. Department of Health and Human Services<br>(See attached supplement.) | Eric Edgardo Matute Castro<br>c/o Allison Norris, Esq., 6355 NW 36th Street, Suite 2201, Miami, FL 33166<br>(See attached supplement.) |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 09/02/1984 | Married | 11/16/2017  – | 01/29/2018 | N/A |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See attached supplement.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

No property damage is claimed in this case.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

No property damage is claimed in this case.

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attached supplement.

| 11. | WITNESSES |
|---|---|
| **NAME** | **ADDRESS (Number, Street, City, and Zip Code)** |
| See attached supplement. | See attached supplement. |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| 0.00 | 3,000,000 | 0.00 | 3,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *[signature] attorney for Claimant* | (305) 573-1106 Ext. 1992 | 11-8-19 |

| **CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM** | **CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS** |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.). |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

2019NOV21AM11:45:28 RC

OFFICE OF CHIEF COUNSEL

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident Insurance?  ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?  ☐ Yes  ☐ No    17. If deductible, state amount.

Claimant does not carry any insurance responsive to this request.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

Claimant does not carry any insurance responsive to this request.

19. Do you carry public liability and property damage insurance?  ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).  ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

**(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

## AUTHORIZATION TO FILE ADMINISTRATIVE TORT CLAIM

I, Eric Matute Castro, authorize Allison Norris, Esq. and Lisa Lehner, Esq. of Americans for Immigrant Justice to submit a claim under the Federal Tort Claims Act on behalf of my minor child, ████████████████, to the U.S. Department of Homeland Security, U.S. Customs and Border Protection, and the U.S. Department of Heath and Human Services, and any other government agency, seeking compensation for the unlawful actions of employees or their agents against me and my minor child.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Printed Name: Eric Edgardo Matute Castro

Signature: _Matute_

Date of Birth: 9/2/1984

A-Number: ████████████

Date: 11/5/2019

## 1. Submit to Appropriate Federal Agency

Office of the General Counsel
U.S. Department of Homeland Security
245 Murray Lane, SW
Mailstop 0485
Washington, DC 20528-0485
ogc@hq.dhs.gov

U.S. Customs and Border Protection
Office of the Chief Counsel
1300 Pennsylvania Avenue, NW
Washington, DC 20229

Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street, SW
Washington, DC 20536-5902

U.S. Department of Health and Human Services
Office of the General Counsel
200 Independence Avenue, SW
Washington, DC 20201

## 2. Claimant's Personal Representatives

Allison Norris, Esq.
Americans for Immigrant Justice
6355 NW 36th Street, Suite 2201
Miami, FL 33166
(305) 573-1106 Ext. 1992
anorris@aijustice.org

Lisa Lehner, Esq.
Americans for Immigrant Justice
6355 NW 36th Street, Suite 2201
Miami, FL 33166
(305) 573-1106 Ext. 1020
llehner@aijustice.org

## 8. Basis of Claim

This claim arises from the U.S. policy of forced family separation that was implemented at the Southern Border and resulted in the forced separation of approximately 3,000 children from their parents.

This policy was carried out with no legal justification and for the express purpose of inflicting emotional and psychological harm to deter immigration, particularly from Central and South American countries. Many of these separated children and their parents, including the Matute family in this case, fled their native countries to lawfully seek asylum upon arriving in the United States. What ensued was a violation of the most fundamental of all human rights in a civilized society, the right to family integrity.

Officials of the U.S. Government forcibly separated these young children from their parents without any allegations of abuse, neglect, or parental unfitness, and without legal proceedings or hearings of any kind. Incredibly, the government had no plan for reunifying the parents with their children. They then detained these young, terrified children in facilities often thousands of miles away from their parents. The forcible separations occurred even though there were viable ways to have kept the children with their parents, including programs that assured the appearances of the parent at immigration hearings. In fact, the father in this case was released by Immigration and Customs Enforcement ("ICE") on his own recognizance, but unfortunately it was after his son was forcibly taken from him and placed in a children's shelter.

Family unity is a foundational principle of child welfare law. In order to grow and develop, children need to remain in the care of their parents where they are loved, nurtured and feel safe. Thus, parents' rights to the care and custody of their children are afforded particularly strong protection under the U.S. Constitution. While parent-child relationships are generally the province of state law, federal law also recognizes the principle of family unity by providing strong incentives for states to keep children with their parents and to provide services to families to prevent separation and maintain family unity. The family separation policy of this Administration eviscerated this bedrock principle, and the Matute family suffered the consequences.

Eric Edgardo Matute Castro ("Mr. Matute"), is a 35-year-old asylum seeker from Barrio Buenos Aires, Juticalpa, Olancho, Honduras. Mr. Matute and his then 3-year old son fled threatened violence from a member of a criminal cartel. Mr. Matute and his son crossed into the U. S. on approximately November 13, 2017 and were transported to Chula Vista Customs and Border Protection ("CBP") Station. CBP officers forcibly separated Mr. Matute and ▮▮▮ on approximately Thursday November 17, 2017. The father and son continued to be separated for approximately 73 days.

Upon arriving to Chula Vista Station, Mr. Matute and ▮▮ were placed in a room with "Officer Nathan." Over the course of the next few hours ▮▮ requested to use the restroom several times. The third time Mr. Matute requested for ▮▮ to use the restroom, Officer Nathan became visibly upset, yelling in English and slamming his hand and throwing a pen on the table. While Mr. Matute does not speak much English, he did hear Officer Nathan yell "Shut up motherfucker!" Because the child was not allowed to use the restroom he was ultimately forced to urinate in his pants. ▮▮ remained in those same urine-soaked clothes for at least 4 days – the remainder of the time he was in CBP custody.

When Officers at Chula Vista observed that Mr. Matute was suffering from a cold, instead of offering him medical attention, they forced Mr. Matute to wear a mask that made it harder for him

to breathe. The officer pinched the metal clip on the nose extremely hard and hurt Mr. Matute's nose. Because Mr. Matute was detained in a room with Officer Nathan, who had been aggressive toward him earlier in the day, Mr. Matute did not feel that he was free to remove the mask, even though it was very uncomfortable. Mr. Matute later requested to make a phone call to his friend who would sponsor him in his release from detention, but Officer Nathan denied this request.

After the initial intake process, Mr. Matute and ████ were moved to a room with several other detainees. Officers later moved them to a room called the "hielera" (i.e. a room kept at freezing cold temperatures). After several hours, officers moved the pair to a smaller room, and then later back to Officer Nathan's office. These constant movements prevented Mr. Matute and ████ from much needed sleep after their long journey. Finally, officers moved father and son from Officer Nathan's office to a small room for the remainder of the night.

On Tuesday morning, November 14th, officers transported Mr. Matute and ████ to another building approximately 20-30 minutes away. In this building, officers confiscated Mr. Matute's cold medicine. The two waited at this building until approximately 6 p.m., when officers transported the father and son to a motel where they were detained along with other fathers and their children.

On Wednesday morning, November 15th, officers transported Mr. Matute and his son back to the same large building as before. Officers placed them in a cell with other fathers and children, where they remained for the rest of the day. Officers later transported Mr. Matute and ████ back to the motel in the evening.

On Thursday morning, November 16th, officers transported Mr. Matute and ████ back to the same large building. On this date, Mr. Matute and other fathers with whom he was detained (████ ██████████████████████████████████████████████), along with their children, had several disturbing encounters with immigration officers. In one encounter, the fathers were approached by a guard and advised that they would be required to relinquish custody of their children, and that the children would be transported to a shelter. Mr. Matute asked why they were being separated from their children, and the officer responded that the fathers and children could not be detained together.

Later, one of the officers directed the fathers to separate their children's belongings from their belongings because they would soon be separating them from their children. This officer said directly to Mr. Matute, "Give your kid to us", to which Mr. Matute objected, "No, I am not going to do that." Another father, Mr. ████, then asked to make a phone call to a legal aid organization, but he was advised that the fathers had no right to make a phone call, stating to him that "no one can help you anyway." The officers warned that they were going to take the children regardless of the fathers' stated wishes and that the refusal to comply would negatively impact the families' asylum cases. Mr. ████ again requested to make a phone call to a legal aid organization, which was denied. All four fathers continued to resist giving up their children, and the officers left.

Later, the officers returned, this time with an officer who identified himself as the officer-in-charge. Mr. Matute continued to object to being separated from his son, ████. The officer barked at Mr. Matute, "Do you want me to take him by force?" Mr. Matute responded that he did not want

that to occur and explained that he only wished to remain together with his child. Mr. Matute pleaded with the officer to think of the situation from his perspective and asked whether the officer would so easily let go of his son if he were in Mr. Matute's position. The officer-in-charge stated that he understood, but that he had to follow the order to take the children, and that these orders come from above.

Mr. Matute again repeated that he would not relinquish custody of his child. The officer-in-charge replied, "Well if you want violence, then you'll have it." Two of the officers removed their tasers from their holsters. Mr. Matute pleaded with the officer not to take his son. One of the other detained fathers, Mr. ███████████, tried to calm Mr. Matute, who at this point, was becoming frantic at the thought of separation from ████.

Despite the fathers' protests and pleas, several officers arrived and took the children away by force. ████ cried and begged to remain with his father, wrapping his arms around his neck. Mr. Matute held ████ firmly in his arms and repeated to the officers that he would not allow them to take his child. Finally, an officer pried ████ from Mr. Matute's arms. While being wrestled away from his father, ████ cried and screamed "Papi! Papi!"

Throughout this ordeal, no one provided any paperwork for Mr. Matute to sign or review in connection with the separation of ████ from his father. Moreover, when Mr. Matute asked why the fathers and children were being separated, the officer-in-charge stated that transferring the fathers to a facility that could house fathers with their children was "too complicated."

On approximately November 17, 2017, ████ was separated from his father and transferred to the custody of the Office of Refugee Resettlement ("ORR") to a juvenile shelter in San Antonio, Texas. Mr. Matute was later transferred to the custody of ICE at Otay Mesa Detention Center in San Diego. While he was detained at Otay Mesa, ICE officers visited Mr. Matute to ask him for the contact information of family members that would be able to care for ████ upon his release from ORR custody. After providing the officers with his family's phone numbers, Mr. Matute asked the ICE officials for information about ████ whereabouts and condition and was told that they were not able to release any information to him about his son.

Mr. Matute was eventually released from ICE custody, on his own recognizance, on or about January 15, 2018 to Jacksonville, Florida, where he lived with a friend for approximately two weeks. On or about January 29, 2018, Mr. Matute and ████ were reunited in Miami after roughly 73 days apart. Mr. Matute recalls ████ having no reaction whatsoever to being reunited with his father. He appeared disconnected from reality. In the months following their reunification, ████, who had previously been potty trained, would not use the toilet and had to wear diapers for approximately five to six months. To this day, ████ also continues to be unwilling to eat solid food, subsisting instead on nutritional drinks like Pediasure. Whereas previously ████ was sleeping in his own bed, since the separation he is too fearful to sleep on his own, and sleeps in his parents' bed. ████ frequently wakes up screaming and crying in the middle of the night, calling the name of a youth care worker from the ORR shelter.

In addition to coping with the effects of separation on his son, Mr. Matute also suffers from constant hypervigilance and anxiousness as a result of having his son physically ripped from his

arms. Mr. Matute sleeps very little and finds it extremely difficult to leave the house, due to severe anxiety. He lives in constant fear that government officials will take away his son again.

## 9. Property Damage

No property damage is claimed in this case.

## 10. Personal Injury/Wrongful Death

The egregious deprivations of basic human rights that Mr. Matute experienced during his time in government custody, the forced separation from his child on or about November 16, 2017 and the prolonged period of separation without benefit of knowing his son's whereabouts and well-being constitute negligence, gross negligence, battery, and intentional infliction of emotional distress, on the part of CBP and ICE officers and supervisors. Mr. Matute's detention violated CBPs own binding policies, settlement agreements, contracts, regulations, and statutes, as well as the U.S. Constitution's clearly established Due Process rights governing immigration detainees as well as the fundamental Due Process right of a father to family integrity. As such, this tortious conduct is not subject to the FTCA's discretionary function exception, or any other FTCA exception.

CBP officials' tortious conduct caused Mr. Matute to suffer non-economic damages, including physical pain and suffering, mental and emotional pain and anguish, loss of consortium, loss of companionship and society, inconvenience, loss of enjoyment of life, and other non-pecuniary losses that continue to this day.

## 11. Witnesses

Eric Edgardo Matute-Castro
c/o Americans for Immigrant Justice
6355 NW 36th Street, Suite 2201
Miami, FL 33166



c/o Americans for Immigrant Justice
6355 NW 36th Street, Suite 2201
Miami, FL 33166

████████████████████

Kevin K. McAleenan
U.S. Department of Homeland Security
Washington, DC 20528

Mark A. Morgan
U.S. Customs & Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20229

Current and/or former employees or agents of CBP and ICE or the Department of Homeland
Security whose identities are presently unknown, including agents assigned to the CBP Stations
in the San Diego Sector in California and ICE agents at the facilities where Matute was detained.

**12. Amount of Claim**
      **12a. Property Damage:** $0
      **12b. Personal Injury:** $3,000,000
      **12c. Wrongful Death:** $0
      **12d. Total:** $3,000,000

**15-19.** Claimant does not carry any insurance responsive to these requests.



**PEEL HERE ▶**

**FedEx** Express   **Package** US Airbill   FedEx Tracking Number **8152 5727 7040**

**0215**

**1 From**

Date 11-8-17

Sender's Name USA Lehrer   Phone 305 573-1106

Company AMERICANS FOR IMMIGRANT JUST

Address 6355 NW 36TH ST STE 2201

City MIAMI   State FL   ZIP 33166-7027

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name Office of Gen Counsel   Phone

Company Dept of Homeland security

Address 245 Murray LN SW   0436

Address

City WASHINGTON DC   State /   ZIP 20528-0485

0134573593

8152 5727 7040

**4 Express Package Service**

Next Business Day
☐ FedEx First Overnight
☐ FedEx Priority Overnight
☑ FedEx Standard Overnight

2 or 3 Business Days
☐ FedEx 2Day A.M.
☐ FedEx 2Day

**5 Package**
☑ FedEx Env

**6 Special**
☐ Saturday

☐ No Signature

Does this ship
☑ No   ☐

**7 Payment**
☐ Sender

Total Packages

A-5P
0485
Delivery Point
BLG 1-107

A

Processed By: DSK-9020-004
11/13/2119 8:21:25 AM

8152 5727 7040



Do not ship liquids, blood, or clinical specimens in this

**FedEx Express**

Extremely Urgent

For FedEx Express® Shipments Only

Contents should be compatible with the container and pack
For shipping terms and conditions and our limits of liability, refer to the
applicable FedEx Express shipping document, the current FedEx Service
Guide, or conditions of carriage.

For more information on FedEx Express services, solutions, and shipping
locations, go to **fedex.com**, or contact your nearest FedEx location.

© 2018 FedEx 155475/155476 REV 3/18

See how FedEx connects the world in responsible and resourceful ways at
**environment.fedex.com**. Join our efforts by recycling this FedEx envelope.

TRK# 8152 5727 7040
(0215)

MON – 11 NOV AA
STANDARD OVERNIGHT
DSR

**SA RDVA**

20528
DC-US
IAD

FTD  974621  08NOV19 NFAX  66AC1/F338/B6A2

▲ Insert shipping document here.

