Pages 1 - 63

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Before The Honorable Edwin G. Torres, Magistrate Judge

```
R.Y.M.R., et al.,            )
                             )
          Plaintiffs,        )
                             )
  VS.                        )        NO. 20-CV-23598-KMW
                             )
UNITED STATES OF AMERICA,    )
                             )
          Defendant.         )
_____)
```

Miami, Florida
Thursday, September 8, 2022

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**
**OF PROCEEDINGS**

Digital Audio Recording 1:33 p.m. - 2:43 p.m. = 70 minutes

**APPEARANCES:**

For Plaintiffs:

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
**BY:  LEE GELERNT, ESQ.**

AMERICANS FOR IMMIGRANT JUSTICE
6355 Northwest 36th Street, Suite 2201
Miami, Florida 33166
**BY:  LISA M. BERLOW-LEHNER, ESQ.**

GARAY LAW
300 Sevilla Avenue, Suite 206
Coral Gables, Florida 33134
**BY:  ROBERT L. PARKS, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Transcribed by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

1    **APPEARANCES**:   **(CONTINUED)**

2    For Defendant:

3                     JUAN ANTONIO GONZALEZ
                         UNITED STATES ATTORNEY

4                     99 Northeast Fourth Street
                    Miami, Florida 33132

              **BY:**   **JOHN STEVEN LEINICKE, ESQ.**

5                     **ASSISTANT UNITED STATES ATTORNEY**

| | |
|---|---|
| 1 | **<u>Thursday - September 8, 2022</u>**                    <u>**1:33 p.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling Case R.Y.M.R. and Eric Castro |
| 5 | versus United States of America, Case Number |
| 6 | 20-23598-Civil-Judge Williams. |
| 7 | Counsel, please state your appearances for the record, |
| 8 | starting with the plaintiff. |
| 9 | **MR. GELERNT:**  Good afternoon, Your Honor.  Lee Gelernt |
| 10 | for the plaintiffs from the ACLU National Office in New York. |
| 11 | **THE COURT:**  Good afternoon. |
| 12 | **MS. BERLOW-LEHNER:**  Good afternoon, Judge. |
| 13 | Lisa Lehner from Americans for Immigrant Justice on behalf of |
| 14 | the plaintiffs. |
| 15 | **MR. PARKS:**  Robert "Bob" Parks, local attorney for the |
| 16 | plaintiffs. |
| 17 | **THE COURT:**  Good morning, Mr. Parks. |
| 18 | **MR. PARKS:**  Thank you. |
| 19 | **MR. LEINICKE:**  Hello, Judge Torres.  John Leinicke on |
| 20 | behalf of the United States. |
| 21 | **THE COURT:**  Good morning -- actually, good afternoon, |
| 22 | isn't it? |
| 23 | This is a discovery hearing.  I believe the request is by |
| 24 | the plaintiff; correct? |
| 25 | **MR. GELERNT:**  Yes, Your Honor -- |

```
1              THE COURT:  Okay.

2              MR. GELERNT:  -- although I think the defendant has

3  pled two items on (Inaudible).

4              THE COURT:  All right.  I saw that, yeah.

5         Okay.  We'll start with your issue.  What's the most

6  important issue you want to tackle?

7              MR. GELERNT:  Would you like me to approach the

8  podium?

9              THE COURT:  Sure.

10        If you want to stay there, too, you can do that, if you'd

11  prefer to have all your documents in front of you.  It's up to

12  you.

13             MR. GELERNT:  Oh.  That's fine, Your Honor.

14             THE COURT:  Okay.  Just move the microphone close to

15  you.

16             MR. GELERNT:  Can I remove my mask?

17             THE COURT:  Uh-huh.

18             MR. GELERNT:  Okay.  So we have a number of RFPs, and

19  we thought we would just go through them.

20        But just as a very brief overview of the case, this is a

21  father and then-three-year-old child who fled Honduras, came to

22  the United States, arrived near San Diego, were separated.  The

23  three-year-old child was separated.  The father was put in

24  detention near San Diego.

25        The three-year-old was sent to live with a strange family
```

 1    in Texas for ten weeks.  He subsequently was reunited after the

 2    ten weeks.  He is experiencing severe trauma to the point

 3    where, when he was reunited, he stands by the window, looking

 4    out for men coming to take him away again.

 5          And so the question in this case, on the merits, is why

 6    was he separated?  We believe there's a good chance that it was

 7    part of the overall Trump Administration's family separation

 8    policy, which I assume Your Honor is familiar with at some

 9    level, of course.

10          The Government suggests, "No, that's not the reason."  The

11    Government says -- the Government -- to back up, the Government

12    has admitted that he was, in fact, the father, but they

13    suggested at the time --

14          THE COURT:  Has admitted what?  I'm sorry.

15          MR. GELERNT:  That the father -- that the adult was

16    actually -- actually the father.  And the reason that that's

17    important is because they've given us the reason for separating

18    initially -- is that they had doubts that he was actually the

19    father.

20          THE COURT:  Oh.  Okay.

21          MR. GELERNT:  And they've -- and they've said that.

22    They've given two reasons.  One is that the child was too young

23    to help them, but the child was three years old, and every

24    three-year-old child knows who his father is, can identify his

25    father.  In fact, when they pulled him away physically from his

father, he said, "*Papi.  Papi*," screaming out.

The other reason they've given is that he only had a copy
of his birth certificate.  They admit that there was birth
certificates for the father and the son, and there was a
national ID card, but they said it was only a copy.

Now, I -- I've been doing this work for a long time,
including family separation.  I have never heard a policy
requiring original documents, especially for an asylum-seeker
who has to immediately flee the country, can't stay around to
look for an original.

But -- and more to the point, the Government has not been
able to produce a single document from the national level or in
San Diego, where the separation occurred, saying that the
parent needs the original birth certificate.

So in light of that, we find, you know, the reasons given
implausible, and we believe that the Government has
unilaterally asserted that it has nothing to do with the larger
Trump separation policies.  But that, of course, is something
that we have a right to explore at discovery.

And, in particular, I think the reason is because there
was something going on in San Diego, we now know.  I mean, the
theme of the whole family separation policy was things have
constantly been coming out after an investigation or discovery.

You know, I litigated the original case that stopped the
family separation policy, and the Government told Judge Sabraw

1    there were 28 children taken away.  Judge Sabraw said, "I want

2    them all reunified."  Six months later, there was an

3    investigation by HHS saying, "No, no, no, no.  There were

4    thousands more that were taken away even earlier in the Trump

5    Administration."

6         Now, I can't say too much about this because there's

7    confidential negotiations with the Biden Administration.  It

8    turns out that even in the very first six months that the Trump

9    Administration came in, there was separation.  So that's been

10   the theme.

11        What we know now about what was happening in San Diego --

12   not only were there thousands of separations, but what was

13   happening in San Diego seemed to be different than other

14   places, suggesting there may have been a pilot project that

15   preceded the ultimate form of issuance of the family separation

16   policies by the Trump Administration.

17        There were -- 25 percent of the separations in the country

18   in the fall of 2017, when our child was separated, were

19   happening in San Diego.  Even though only 3.5 percent of the

20   apprehensions in the entire southwest border were happening in

21   San Diego, yet 25 percent of the separations were occurring.

22        And maybe even more to the point, the MO that was -- that

23   was -- that happened here is doubts about parentage -- claimed

24   doubts about parentage.  There were, in San Diego -- around the

25   whole country, there were -- were --

1      **THE COURT:**  Let me stop you.

2      **MR. GELERNT:**  Yeah.

3      **THE COURT:**  Get to the point about what specific

4  requests that you think you're entitled to that they're not

5  giving to you.

6      **MR. GELERNT:**  Yeah.  I apologize, Your Honor.

7      So what we're asking for is the documents related to the

8  formal issuance of the family separation policy, which was

9  called the zero-tolerance policy.

10      What we have said -- that we believe that we have the

11  right to ask the Government to do a search for everything

12  related to that so we can see the evolution of the policy and

13  the different tentacles it had.  But the Government said,

14  "Well, that's burdensome."

15      So what we have done is said, "You can have zero burden in

16  this situation."  The documents have already been produced in a

17  few other cases.  So it's literally a click of a button for the

18  Government to produce the documents.

19      And so there's zero burden for them to produce the

20  documents.  They have them all compiled at Main Justice.

21  They've been reviewed by Main Justice and produced in a number

22  of cases to avoid the burden.  We're willing to accept that.

23      The Government says, "Well, none of that formal policy has

24  anything to do with this because it didn't occur until 2018."

25  But as I've said, the separations were already occurring way

```
 1   earlier, and in San Diego, there was something going on.

 2          THE COURT:  In other words, the Government's position

 3   was that because this -- the abduction took place when again?

 4   2000- --

 5          MR. GELERNT:  November 2017.

 6          THE COURT:  '17?

 7      And then -- and then the -- the policy that you're talking

 8   about was enacted after?  Is that what you're saying?

 9          MR. GELERNT:  Exactly, but we know -- I mean, what

10   we're trying to find out is exactly what was going on before

11   the issuance of the formal policy.  We know that there was a

12   pilot project in El Paso that was happening.  We know that the

13   Trump Administration hid thousands of separations way before

14   the formal issuance.

15      We know, in San Diego, that 80 percent of the separations

16   in the whole country that occurred by doubting parentage

17   happened in San Diego, literally 80 percent of them.  We

18   believe that there may have been a pilot project going on in

19   San Diego before the formal issuance of the policy to separate

20   based on doubts.

21      And, in fact, the main plaintiff in Judge Sabraw's case in

22   San Diego, the *Ms. L. v. ICE* case, Ms. L. came exactly the same

23   month in San Diego.  They doubted her parentage.  It turned out

24   she also was the mother, and -- and Judge Sabraw made her the

25   main plaintiff in all the family separation litigation going
```

```
 1    on.
 2         So, again, we believe that the Government is simply
 3    litigating the merits.
 4         THE COURT:  So the -- the production in that case --
 5    were you counsel in that case?
 6         MR. GELERNT:  I was.  There was no discovery because
 7    Judge Sabraw ruled on a preliminary injunction quickly and
 8    wanted the children reunited as quickly as possible, and so we
 9    didn't do discovery.
10         But we did -- we did have facts come out about Ms. L., and
11    the Government said, "Well, we had doubts about her parentage,"
12    just like in this case.
13         Judge Sabraw said, "Well, do a DNA test immediately.  I
14    want to know."  Of course, the DNA test showed it was the
15    mother.
16         And, again, we have Jonathan White -- Captain Jonathan
17    White, who was commander back then, was the first one to really
18    blow the whistle on the Trump Administration and sent an email
19    with concerns, in the fall of 2017, about the increase in
20    separations, specifically referenced our -- our case, and noted
21    that people were being sep- -- families were being separated,
22    both because of criminal prosecution and because -- and there
23    were cases listed with doubts about parentage.
24         And so our view is that we don't want to hamstring
25    Judge Williams.  Again, the theme of the family separation
```

1    practice is more and more keeps coming out.  The judge -- the

2    Government has asserted their unilateral version of the facts.

3         We believe there's more than enough to warrant discovery,

4    especially given that there's zero burden to the Government.

5    They can just click a button and give us the documents

6    Main Justice has already collected and reviewed about the

7    zero-tolerance policy and the evolution of it.

8              **THE COURT:**  And -- well, how do you know that?

9              **MR. GELERNT:**  We know that because that's been

10   publicly -- I am involved in other cases.  We know that because

11   the Government has made that clear, and I would doubt that the

12   Government would dispute that those documents exist and that

13   they can be -- they can be given to us with the click of a

14   button, if they desire.

15             **THE COURT:**  Okay.  And -- hold on.

16        Did you send me your materials?  Because I'm trying to

17   pull up the actual request that you're talking about.

18             **MR. GELERNT:**  Your Honor, if -- if I can approach, I

19   can give you our exhibit with each of our requests --

20             **THE COURT:**  Oh.  Great.  Yeah, go ahead and do that.

21             **MR. GELERNT:**  -- and the Government's response.

22        And these particular requests are 39 through 44 and are

23   actually on Page -- on Page 11 of that exhibit.

24             **THE COURT:**  Okay.  Thank you.

25             **MR. GELERNT:**  And I think, as Your Honor will see,

 1   that -- we believe that they needed to do a fresh search for

 2   everything, but all (Inaudible) were stipulated to because the

 3   Government knows there -- we said we would just take the

 4   documents produced in this C.M., slash, A.P.F. case, which are

 5   already compiled.

 6        And the Government's actually produced them in several

 7   other cases to avoid burden.

 8        **THE COURT:**  Now, the first thing the Government says

 9   is that CBP has produced documents from the San Diego Sector

10   for the relevant time period.

11        Did you get documents from the San Diego Sector?

12        **MR. GELERNT:**  We did, Your Honor.  We -- we -- we hope

13   that those are -- those are full.  We haven't done depositions

14   yet.

15        But what we haven't got are the national documents about

16   how the policy was developed and what -- what was being

17   discussed, and I think those are the critical documents to know

18   whether they link to the family separation practice.

19        **THE COURT:**  And how do you know that there was a

20   national -- in other words, what -- how do you -- what does

21   that mean?  In other words, what is a national policy, as

22   opposed to something that San Diego received?

23        **MR. GELERNT:**  Well --

24        **THE COURT:**  Because, you know, the way the government

25   works is -- it's not one mega thing other than the

```
 1   Federal Register; right?

 2         MR. GELERNT:  Right, Your Honor, but I think what was

 3   happening with family separation practices -- it was undercover

 4   until the formal issuance of it in 2000- -- the spring of 2018.

 5      So the Texas pilot project, for example, the El Paso pilot

 6   project, only came out through investigation.  All these

 7   separations that were happening at the time of our separation

 8   only came out through an HHS investigation.

 9         And so, day after day, policies were coming out and more

10   separations, and I think that's why we're concerned.  I think

11   there -- and there -- you know, there's been --

12         THE COURT:  But if there were a policy that came out

13   and it's in the San Diego -- and the San Diego Sector received

14   it, why isn't that responsive?

15         MR. GELERNT:  Well, because that was the

16   zero-tolerance policy in --

17         THE COURT:  Well, no.  You asked for documents related

18   to the verification of parentage or legal guardianship.

19         MR. GELERNT:  Right.

20      So there's -- so I -- let me step back, Your Honor.  I

21   apologize because I know I'm moving pretty quickly.  The

22   zero-tolerance policy that was enacted in 2018 dealt with

23   criminal prosecution.  So the parent comes, and they prosecute

24   the parent for something, maybe illegal entry, and so the child

25   and parent are separated that way.
```

1    What we know are two things.  One is that, before the

2    formal issuance of that policy, there were separations

3    happening, based on criminal prosecutions before then.  But I

4    think, more to the point for this case, what we also now know

5    is that there were more informal practices and policies that

6    weren't part of the zero-tolerance issuance, that they were

7    based on doubts about parentage.

8    And that's what we're trying to explore.  Something --

9    again, something was going on in San Diego.  80 percent of all

10   the separations, based on doubt about parentage, were happening

11   in San Diego in the fall of 2017.  And I think that's what we'd

12   like to explore.

13   Were there national emails and documents talking about

14   other ways to do separations?  Was there -- there is an

15   enormous back-and-forth between the Government, without formal

16   issuance of a policy, "What are the ways in which we can

17   separate children?"

18   And so, ultimately, they didn't put out a policy about

19   parentage, but we think there was an informal policy, or at

20   least a pilot project, in San Diego.

21       **THE COURT:**  But how -- yeah.  In other words, what

22   you're saying is they didn't put out a formal policy, but there

23   may have been an informal one that people were following?

24       **MR. GELERNT:**  Well, exactly, Your Honor, and -- like

25   the pilot project in El Paso (Inaudible) policy.

1      **THE COURT:**  And if you're right -- if you're right,

2  how do you know it would have been reduced to writing

3  necessarily?  Because that would have been more of a formal

4  policy; right?

5      **MR. GELERNT:**  Well, we don't know, Your Honor, but

6  what we will get from those documents potentially are people

7  talking about other ways to separate.  Maybe they'll talk

8  about, you know, "Look at parentage" and -- and --

9      **THE COURT:**  Your request is to ask for policies,

10 procedures, training manuals, and instructional documents

11 relating to the verification of parentage.  What you're

12 suggesting does not really fall within that; right?

13     **MR. GELERNT:**  Well, I don't know, Your Honor.  There

14 may be written documents.  You know, there may not be formal

15 policies like the Federal Registry, like you suggested, but

16 there may very well be emails or back-and-forth memos between

17 the national Trump Administration people.  We just don't know.

18     I think what's happening, Your Honor, is the Government is

19 sort of litigating the merits.  I think there's more than

20 enough evidence that something was going on in San Diego, on

21 top of the fact that, every six months, some new bombshell

22 comes out about the family separation policies.

23     And -- and we're simply suggesting that we have a right to

24 look at that, and Judge Williams shouldn't be just presented

25 with one unilateral version of the facts that this was merely

1  parentage -- a reckless parentage separation.  And I think the

2  reason we -- we took all those and just reduced it to what the

3  Government has already compiled is I think that reduces any

4  burden on the Government.

5          THE COURT:  For example, in 41, you say, "Produce

6  documents created, modified, sent, or received by the ICE

7  San Diego field office relating to a zero-tolerance policy

8  or" -- "and/or other family and" -- "separation and

9  reunification practices"; right?

10      And then their response is, other than objections,

11  "Subject to the foregoing, nothing was found for San Diego ERO

12  within the relevant time frame of January 20-" -- "2017 to

13  2018."

14          MR. GELERNT:  Your Honor, I think what the Government

15  is saying is that they didn't find any formal policies in

16  San Diego about this, but I think what we are suggesting is

17  that this was all going on undercover.  And there may very well

18  be emails.

19      What we know is, as to other policies -- other parts of

20  the family separation policy, emails have come out talking

21  about what should be done, and they were very undercover.  And

22  so I think that that's what we're talking --

23          THE COURT:  Well, given the nature -- given the nature

24  of your -- state of your case, that would be expected; right?

25  In other words, there weren't -- if everybody involved in it

1    was doing something that they knew would probably be illegal,

2    they weren't necessarily going to put it in the Federal

3    Registry.

4          MR. GELERNT:  Well, exactly, Your Honor.  That's

5    exactly right.

6          THE COURT:  So -- but then the question is whether or

7    not -- what do I do about Request 41, for example?  What do I

8    do about them saying, "We found nothing within the San Diego

9    office received or communicated relating to your question"?

10   What do I do about that?

11         MR. GELERNT:  Well, I think, Your Honor -- so, for

12   example, if there are emails between top Trump Administration

13   officials in this batch of stuff saying, "Let's explore ways

14   beyond criminal prosecution to separate.  Let's tell people

15   that" -- there could have been phone calls, there could have

16   been different types of things, but just that email saying,

17   "Let's explore, as pilot projects, parent" -- "separations

18   based on doubts about parentage," we would know, then, that we

19   need to depose those people and ask them, "Did you communicate

20   in some other way?"

21         THE COURT:  Well, that could be asked by this

22   question:  "Did you" -- "have you gotten identification of the

23   people who are most knowledgeable of" -- "of the stuff with

24   the" -- "with the separation practices in San Diego Sector,"

25   for example.

```
 1        Have you gotten that?

 2        MR. GELERNT:  Well, we've only been able to depose one

 3   person so far, which, you know, brings us to sort of a larger

 4   question about the discovery, is the Government has not been

 5   willing to find former employees, unlike Main Justice, in all

 6   the other family separation cases.  So we are way behind in the

 7   deposition schedule.

 8        And so we'll have to depose them, but I think ultimately

 9   this is going to be a situation where we are going to need to

10   find what was really going on at the highest levels to know how

11   to pinpoint what was going on in San Diego.

12        THE COURT:  Well, have -- who have you deposed?

13        MR. GELERNT:  We've only deposed one person, who was

14   the Border Patrol agent who arrested the family.  He claims he

15   wasn't involved in the separation.  He was from CBP.  He says

16   only ICE did it.

17        So we have not been able to depose any ICE officials.

18   Those depositions are coming up, but they've been substantially

19   delayed by trying to locate -- most of them are former

20   employees.

21        THE COURT:  I see.

22        So -- but they've identified for you who they are, and

23   then you're looking for them?  Is that the idea?

24        MR. GELERNT:  Yes, Your Honor.

25        THE COURT:  I see.  Okay.
```

1          **MR. GELERNT:**  But, you know -- and I -- I understand

2    Your Honor going through each one of the --

3          **THE COURT:**  That's what we do.

4          **MR. GELERNT:**  No.  Exactly.

5          **THE COURT:**  You can't just say, "Oh, this case sounds

6    interesting.  Just give them everything related to it."

7          **MR. GELERNT:**  No, no, no.  Exactly, Your Honor, but I

8    did want to say that, to the extent Your Honor feels like,

9    "Well, these are going to be overbroad," the documents that

10   have already been compiled are the documents the Government

11   says are related to the evolution of all these family

12   separation policies.

13       So in that sense, we compromised and said, "We'll just

14   take those documents and look at those documents."  And given

15   that there's no burden, given that we know so much is

16   (Inaudible) just coming out, we really don't see the reason, at

17   the discovery stage, to hamstring Judge Williams with not

18   having a full background of what was happening.

19         **THE COURT:**  Okay.  Let me stop you there and turn to

20   the Government on that point.

21         **MR. LEINICKE:**  Thank you, Your Honor.

22       If I may just address two very brief issues that were

23   raised by Mr. Gelernt, and then I'll go straight to your

24   question.

25       The first is Mr. Gelernt identified this issue of the

1    Government's admission that Eric is the father of -- I don't

2    know if -- should I -- should I use his initials because of the

3    transcript?  I'm just going to call the son "R.Y.M.R."  That's

4    his initials.

5              **THE COURT:**  Got it.

6              **MR. LEINICKE:**  So that admit -- that admission was

7    done, you know, as part of the -- our normal discovery

8    practice.  At this point, we have received multiple medical

9    records.  He's filed a lawsuit.  It would be unreasonable for

10   the United States, at this point, to not admit to -- that --

11   that these are -- that Eric is the father of R.Y.M.R.

12        That's different than in 2017, when they show up at the

13   United States border and are interviewed as part of their

14   credible fear and R.Y.M.R. is non- -- is refusing to speak or,

15   you know, too afraid to speak to the government officials and

16   there's no appropriate documentation.

17        So the fact that there was a question as to their

18   parentage in 2017 is not -- you can't say, "Well, the fact that

19   this was admitted in 2022 goes back to them."  So I'd like to

20   point that out.

21        And then, just as to the second point, he -- Mr. Gelernt

22   raised the issue of finding prior -- these former employees.

23   You know, I have done my best to -- to assist in that process,

24   but, again, these are former employees.

25        One of them, we learned, was in Mexico for a portion of

1    time.  So they may be a little less high-profile than, for

2    example, you know, Captain White or Kirstjen Nielsen or someone

3    like that in terms of finding them for deposition.

4        So as to the -- the -- I think the central thrust of the

5    plaintiffs' argument -- that these documents are necessary to

6    kind of uncover this large conspiracy that has been taking

7    place as to the real reason why the separation occurred.

8        Just as an initial point, Your Honor, what has been

9    actual -- what are the actual causes of action in this case?

10    It's assault and battery that are related to the physical

11    separation of the plaintiff.

12        So while they were in ICE custody -- and I think, at this

13    point, it's -- it's admitted on all sides -- and, certainly,

14    the United States has made the position -- CBP did not separate

15    them.  The separation happened in ICE custody.  We have

16    produced discovery and -- including interrogatories to that

17    effect.

18        So to the extent that any of this discovery is directed

19    towards policies, practices, procedures in terms of family

20    separation at CBP, there can be no showing of relevance or

21    proportionality to this case because it's undisputed that CBP

22    did not separate these people.

23        In fact, they -- the person that they did depose,

24    Border Patrol Agent MacCallum, who did the plaintiffs' credible

25    fear examination -- he testified that they -- you know, he was

1    the individual that was responsible for doing their credible

2    fear investigation and that when he -- when they left CBP

3    custody, they were together.

4         But, again -- so going back to, "Well, what about when

5    they were in ICE custody?  This all must have been a giant

6    conspiracy to actually manufacture a reason to separate them,"

7    well, the materials that I provided the Court on Monday before

8    noon -- that is just -- the discovery that has been shown to

9    date shows that that's not the case.

10        So we know the names of the individuals that -- the

11   deportation officer who initially reviewed their paperwork and

12   was -- kind of kicked -- got the ball rolling on whether it was

13   appropriate to separate them.  She then referred this up to her

14   supervisor, a senior deportation officer, who then referred it

15   to the AFOD Ortiz, who is, like, kind of a head of -- of that

16   San Diego office.

17        All of those individuals are set for deposition.  All of

18   the relevant communications and emails that specifically

19   discuss this case have been produced.  And as part of the

20   documents that I provided the Court, as an example, in addition

21   to the emails back and forth where -- and this is at

22   Document -- so the emails were saying, "Hey, I have concerns."

23        So, for example, Exhibit N is an email from Mario Ortiz.

24   It's an email chain dated November 20th, 2017.  This is three

25   days after the separation occurred.  "Please ensure the reason

1 of separation for the fathers is accurate.  Please add

2 information, if necessary."

3      This was related to four fathers who received significant

4 media attention.  They were interviewed by BuzzFeed and various

5 publications while in ICE detention related to their separation

6 from their children.

7      So this is a -- he's asking, "The Honduran family unit

8 consisted of a male, age 33, and male minor, age 3.  Unable to

9 verify relationship as minor is too young to answer questions."

10 And later -- and this is part of, again, multiple email chains

11 between these four individuals.

12      What is the -- for example, Exhibit J, just before that --

13 this is all on November 15th, 2017.  So this is when they're

14 actually trying to determine whether it is or is not

15 appropriate to separate the family down at the bottom.  So

16 Maria Chairez sends an email up to her bosses.  "Greetings.

17 Please see below and advise.  Thank you."

18      "Below Honduran family unit consisted of a male and male

19 minor.  I'm unable to verify relationship as minor is too young

20 to answer questions.  Requesting guidance to separate and

21 detention for adult at OMDC" -- that's Otay Mesa Detention

22 Center -- "and ORR," Office of Refugee Resettlement, "placement

23 for the minor."

24      Mario Ortiz -- "What is the criteria we use or take into

25 account to separate?  No BC," birth certificate, "or just a

1  copy of birth certificate?  Prior D's" -- I'm not sure what

2  that means -- "or fugitives?  Is there a standard operating

3  procedure, or is there a judgment call?"

4      So throughout this, Your -- the documents that have been

5  produced show the present contemporaneous analysis that the ICE

6  agents are making as the -- as it relates to these -- these

7  plaintiffs.

8      And, furthermore, they -- because they could not verify

9  the information that had been presented, they ultimately took

10  the father to the Honduran consulate and had him have a

11  face-to-face interview with the Honduran consulate to -- in

12  Los Angeles.  So they had to transport him from San Diego to

13  Los Angeles.

14      Later on, at the very -- you know, there were several

15  emails related to that effect, but the -- Exhibit S, that I

16  provided the Court, is an email from the 24th from

17  Gladys Martinez -- she is the senior deportation -- supervisor

18  detention and deportation officer -- where she says:

19      "Hello, Lauren.  Mario's statement" -- that's Mario Ortiz,

20  AFOD Ortiz.  "Mario's statement below was affirmed by a

21  Consulate General of Honduras, Mr. Pablo Mario Ordoñez, in

22  Los Angeles, California, via video face-to-face interview with

23  the subject on Wednesday, November 22nd, 2017."

24      "The subject confirmed that he only provided officers with

25  his birth certificate and a consulate card.  That is the PDF

```
 1    that is attached.  Additionally, on Wednesday, per our request,

 2    Jose Machado at OMDC reverified what was present in the

 3    A-file."

 4         "So as per your request this morning, SDDO Moresco

 5    requested once again that Callahan reverify what was in the

 6    A-file.  It confirmed each time that the subject provided only

 7    his birth certificate and a consulate card, thus not allowing

 8    us to confirm the family relationship between the adult and the

 9    minor child."

10         So I think that this, very conclusively, rebuts the

11    narrative that -- this kind of giant universe of unknown

12    documents, which the plaintiffs have not provided to the Court,

13    not provided the -- the relevant discovery from C.M./A.P.F. in

14    terms of what requests are out there --

15              THE COURT:  What is C.M./A.P.F.?

16              MR. LEINICKE:  So the plaintiffs are requesting

17    discovery from two cases out of the District Court of Arizona.

18    One is called C.M.  One is called A.P.F.

19              THE COURT:  Oh.  Okay.  The plaintiffs' names.

20              MR. LEINICKE:  And those -- and those -- and so those

21    are together known as the C.M./A.P.F. cases.

22              THE COURT:  Got it.

23              MR. LEINICKE:  When you're -- you get savvy in this,

24    you'll start -- you know, you'll hear those case -- those case

25    names over and over.
```

```
 1              THE COURT:  That's for you to get savvy, not for me.

 2                          (Laughter.)

 3              MR. LEINICKE:  And the plaintiffs have said, well,

 4   despite the responses that we've already produced, despite

 5   that, in their follow-up, because of all of this -- all of

 6   these emails and all this --

 7              THE COURT:  Has this been produced?  Has it all

 8   been --

 9              MR. LEINICKE:  Yes.

10              THE COURT:  Okay.

11              MR. LEINICKE:  This was all part of the original round

12   of discovery.

13         Prior counsel for the plaintiffs and I had hammered out a

14   very, very extensive scope of search for all the documents

15   related to R.Y.M.R. and his father, their A-numbers, and the

16   types of documents that were going to be produced.  And this

17   was back in 2021, and then the cases were stayed for a

18   significant amount of time, and now -- now here we are.

19         So this is -- these renewed responses that the Court is

20   seeing today and is ruling on is plaintiffs' second bite at the

21   apple on what they would like to have produced.  But everything

22   that I just referred to the Court has been produced, and when

23   we responded to this discovery, we kind of wanted to cover our

24   bases.

25         So I addressed the C.M./A.P.F. alternative, and I
```

1   addressed the specific discovery that was requested to make

2   sure that our objections were appropriately preserved for the

3   record, but -- and I'm sorry for not answering your question,

4   Your Honor.

5          C.M./A.P.F., as I said, are two cases that are -- so in

6   A.P.F., it deals with two five-year-old children who were

7   separated while in CBP custody in Arizona.  The father was

8   detained by ICE in Arizona, Georgia, and Texas, and the

9   children were placed in ORR custody in New York, Texas, and

10  Michigan.

11         That was a 2018 separation, and C.M. was a May 2018

12  separation.  The separations occurred in New York and Arizona

13  by CBP, and the children were held in Arizona, California,

14  Nevada, and Texas.

15         Your Honor, that's nothing like our cases.  And here, our

16  plaintiffs were separated by ICE in San Diego.  The father was

17  kept in San Diego, in Otay Mesa, in ICE custody, and the child

18  was transferred to Texas and to ORR custody.

19         One of the other issues that I believe is being litigated

20  in the Ms. L. and, certainly, in the C.M./A.P.F. is -- is that

21  this kind of -- this allegation that the Government lost

22  certain children, didn't appropriately assign them A-numbers,

23  they got -- they disappeared into the system.  That's not what

24  the case is here.

25         Your Honor, again, previous discovery that has been

 1   provided to the plaintiffs shows that the Government, at all

 2   times, knew where the child was, that they immediately began

 3   reunification proceedings with his appropriate sponsor, which

 4   was his mother at the time, Mrs. Ramirez, and that Mrs. Ramirez

 5   had routine contact with both her son and with her husband, who

 6   is still in ICE detention.

 7        So the discovery that they're seeking has just no

 8   relevance to the causes of action -- not only to the facts

 9   as -- as they -- as we know and are kind of consensually agreed

10   between the parties, but as to the causes of action that

11   they've alleged, which is assault, battery, and negligence and

12   intentional infliction of emotional distress as a result of the

13   assault and battery.

14        That -- so what -- what a possible email from 2019 from a

15   senior adviser to another senior adviser could possibly have to

16   do with how R.Y.M.R. feels today as a result of being separated

17   from his father in 2017 -- I just can't see it, and I

18   respectfully submit that it's not -- it's not within the

19   proportionality of this case to -- for -- to make this an

20   issue.

21           **MR. GELERNT:**  Your Honor, could I respond?

22           **THE COURT:**  Yeah.

23           **MR. GELERNT:**  So, first of all, I'm not sure I

24   understand what the Government's saying about laying out the

25   claims.

1          The basic core claim, as the Government would have to

2     admit, is this child was unlawfully taken from his child -- I

3     mean, from his -- from his father.  So that's the basic claim.

4     That's the basic core of the family separation policies.  It's

5     the basic claim in C.M.

6          The Government says why I didn't provide you with the

7     documents.  I have those documents.  I'm happy to provide them

8     to you, if Main Justice will allow me to provide them to you,

9     but I can't do it.  And I also can't look at them for purposes

10    of this case, but if Main Justice would sign off on giving you

11    those topics -- I think the way that --

12         **THE COURT:**  In other words -- in other words -- run

13    that by me again.  I missed -- I missed the --

14         **MR. GELERNT:**  So I have those documents from another

15    case, the documents from the C.M./A.P.F. --

16         **THE COURT:**  Okay.

17         **MR. GELERNT:**  -- but I'm not going to look at them for

18    purposes of -- I can't use them for purposes of this case.  If

19    Main Justice will sign off on me using it for purposes of this

20    case or providing them to you --

21         **THE COURT:**  Was that the -- was that the (Inaudible)

22    of a protective order in that case?

23         **MR. GELERNT:**  Yes.  Yes.

24         **THE COURT:**  I see.

25         **MR. GELERNT:**  But -- I mean, if Main Justice signs off

 1    in saying, "You can" -- "you have them from another case.  Use

 2    them for this case," fine.  If they say, "We'll sign off and

 3    give them to Judge Torres," fine.

 4         THE COURT:  Well, let's say -- let's say I -- let's

 5    say I entered an order -- I don't know if I can, but let's just

 6    say I entered an order that says you may look at them --

 7    right? -- notwithstanding your protective order -- and I'm not

 8    sure we can do that, but let's assume I could.

 9         If he's right that all those documents relate to an issue

10    in 2019 in different sectors as compared to the documents that

11    you do have, which are contemporaneous state of mind emails

12    relating to this child -- right? -- why do you think -- well,

13    is there a reason that you think there's something there that

14    would benefit you in light of this?

15         Is that what you're saying?

16         MR. GELERNT:  Yes.  Let me be clear because I know

17    what's in the documents, roughly --

18         THE COURT:  Right.

19         MR. GELERNT:  -- not completely, and I don't think the

20    AUSA does.

21         THE COURT:  Okay.

22         MR. GELERNT:  The documents are not specific to the

23    separation in 2018.  They are the documents related to the

24    entire family separation practice.  So they talk about the

25    evolution, from the beginning of the Trump Administration

```
 1   coming in, "How are we going to secure the border?  What

 2   methods can we use to separate children?" and all of that.

 3        And I think the easiest way to conceptualize our request

 4   here is imagine if our separation occurred in El Paso in the

 5   same month, November of 2017, and we came in, and the

 6   Government said, "Well, we've provided you with the written

 7   documents/policies in El Paso, and that shows you everything."

 8        Well, the El Paso thing was kept secret and done

 9   undercover.  So I don't know that it would have fully shown it.

10   That's what we think may have been happening in San Diego, but

11   how it would pinpoint -- and what we think is probably

12   happening --

13        THE COURT:  The problem I have, though, is in light of

14   the documentation that you have --

15        MR. GELERNT:  Right.

16        THE COURT:  -- right? -- is -- he makes a compelling

17   point that it takes -- there's a huge leap between that and

18   what you're trying to do, based on the information that you

19   have.

20        MR. GELERNT:  Well, I --

21        THE COURT:  So, for example -- right? -- if you depose

22   the Mario -- who's this Mario Ortiz guy?  Who's the one who

23   said that, whatever you think, it beats the home test or --

24   something about a home test, something that makes your head to

25   shake or something like that?
```

```
 1              MR. GELERNT:  Right.

 2        Your Honor, I -- I -- I apologize for interrupting.

 3              THE COURT:  Who's that?

 4              MR. LEINICKE:  Richard Abend, Your Honor.

 5              THE COURT:  Richard who?

 6              MR. LEINICKE:  Abend, Your Honor.

 7              MR. GELERNT:  Right.

 8        Your Honor, I just want -- I apologize for stopping you.

 9   I just -- the Government put in documents that were marked

10   confidential in the protective order.  So I think maybe the

11   transcript on that -- on that piece of email by Abend probably

12   needs to be redacted in the transcript.

13              THE COURT:  Well, there is no transcript right now --

14              MR. GELERNT:  Okay.

15              THE COURT:  -- but that's okay.

16              MR. GELERNT:  Right.

17        At this point, there is --

18              THE COURT:  If you order a transcript, order a sealed

19   transcript.

20              MR. GELERNT:  Right.  Okay.

21              THE COURT:  So -- so whatever the -- so say that this

22   Mario Ortiz guy, who's communicating and asking about this

23   child -- right?  And if you -- and you, A, depose him about

24   these documents and say, "Well, is there anything else going on

25   in your mind that you had received instruction, either in
```

1  writing or informally, from somebody at" -- "at DHS DC?"

2  Right?

3          **MR. GELERNT:**  Uh-huh.

4          **THE COURT:**  And he says, "Oh, yeah.  We were told that

5  they were going to have this out there"; right?  I now have a

6  potential connection between what happened with this child in

7  San Diego in -- in November of 2017 and what you're talking

8  about; right?

9       So just because it's a case involving a separated child,

10 if -- that's not a -- that's not a legal category of itself --

11         **MR. GELERNT:**  Right.

12         **THE COURT:**  -- that means that you can, therefore,

13 have discovery in all of the cases that relate to anything

14 having to do with the separation of a child.

15      You see my point?

16         **MR. GELERNT:**  I do, Your Honor.

17         **THE COURT:**  It would be different if you had a class

18 action, for example.  If you had that case that you were

19 talking about, and in the class discovery context -- right? --

20 the judge has to basically, then, do much broader production.

21 That makes perfect sense because it's class discovery.

22      And, therefore, one of the issues you're looking at is --

23 I'm just -- this is -- this -- this person just is

24 representative of a broader thing.  It would be -- it's easier

25 for me to compel discovery that has nothing to do with the

```
 1   case.

 2           MR. GELERNT:  Well, that's fair, Your Honor.

 3       The only thing I would push back on, Your Honor,

 4   respectfully, is that we know -- we know -- I mean, the AUSA is

 5   talking about a giant conspiracy.  That's exactly what the

 6   Trump Administration (Inaudible) family separation practices.

 7   So we could pile an entire courtroom with media articles and

 8   reports.

 9       And so what I think what we're saying is that's exactly

10   what was happening all over the country.  So, again, if we were

11   here individually with an El Paso case, I think the same

12   arguments would be flying back and forth.  But we would have

13   ultimately been proven right that there was something going on,

14   you know?

15       So I think --

16           THE COURT:  The problem -- the problem is that it

17   would be different if Stephen Miller had gone down there and

18   taken the child; right?  Then I could do a lot of different

19   things.

20       What I have is I have a series of people doing something.

21   You have documents relating to their thought process.  And what

22   you're saying is, in addition to what they put down on paper

23   here, there were other actors that they were taking into

24   consideration that go well beyond San Diego and go well beyond

25   these communications; right?
```

1          **MR. GELERNT:**  Well, they -- they --

2          **THE COURT:**  Because if the answer to that is no, if

3    all they did was literally -- this is the only thing they were

4    talking about, and there were no other influence, whatever that

5    does to your case, it does; right?  It --

6          **MR. GELERNT:**  Well, at a minimum, the Government has

7    admitted it's basically reckless because --

8          **THE COURT:**  Whatever.  Right.  Whatever, but what --

9          **MR. GELERNT:**  -- there was no policy that a copy of a

10   birth certificate --

11         **THE COURT:**  How does the -- so from your point of --

12   point of view, it changes the equation.  If an admission to

13   that, which I have -- I can show you a grander political

14   picture, if you will, of everything that was going on and that

15   ultimately my client's case was only a little bitty part of;

16   right?

17       And your argument, using that, is therefore what?

18   Therefore --

19         **MR. GELERNT:**  Well, therefore, it was at the direction

20   of DHS.

21         **THE COURT:**  And therefore?

22         **MR. GELERNT:**  And that's where we know the whole

23   family separation practice went from the White House --

24   literally the White House, Stephen Miller, and on.

25         **THE COURT:**  But having proven that, what does that do

```
 1   to your claim?  How does that change your case?
 2          MR. GELERNT:  Okay.  Your Honor, I'm sorry.  I
 3   misunderstood your question.  I think that's an important
 4   point.  What the Government is basically suggesting is this was
 5   just a simple mistake, even though there was no policy saying
 6   you needed the original birth certificate.
 7          At a minimum, we think it's reckless, but what it shows is
 8   it was deliberate, that with -- the word that came from the
 9   White House and DHS was, "Put your finger on saying there's a
10   doubt" almost all the time.
11          And why -- the reason -- the evidence we have that goes
12   beyond just general suspicion about what the Trump
13   Administration was doing is 80 percent of the separations in
14   the entire country that were based on doubt about parentage
15   came from this one sector in San Diego, where our plaintiffs
16   were separated and where the main plaintiff, Ms. L., was
17   separated.
18          And Judge Sabraw made her the main plaintiff in a class
19   action about the entire Trump separation policy.  So Judge --
20   and Judge Sabraw is intimately familiar with everything that
21   went on, and so I think there's more than enough evidence.
22          Now, if the Government was saying this is a burden for
23   them to collect all the documents, we could see it.  But since
24   they literally just have to click a button, or you could issue
25   an order overriding the protective order, you know, I think
```

1    that would solve it.  And, ultimately, if there's nothing

2    connecting it, then there's nothing connecting it.

3        But I think -- we're at the discovery stage.  This is a

4    three-year-old child who spent ten weeks away.  The Government

5    says they tried to immediately reunify.  Ten weeks is a

6    lifetime for a little three-year-old child.  There was

7    literally no basis for separating.

8        They keep saying there was doubts about it.  There were

9    two birth certificates.  We've asked them, "Was there anything

10   more than just that they were copies?  Was there anything to

11   suggest they weren't authentic?" first of all.

12       **THE COURT:**  Now, here, they were saying that the child

13   didn't have a birth certificate.  Is that not correct?

14       **MR. GELERNT:**  That's not correct.  The Government has

15   admitted that.

16       **THE COURT:**  I see.

17       Okay.  But it could also be that these people made a

18   mistake; right?  It could also be that.

19       **MR. GELERNT:**  And I think that's what discovery is

20   for.

21       **THE COURT:**  Right.

22       So here's -- here's --

23       **MR. GELERNT:**  But what's (Inaudible) is the 80 percent

24   of the entire country's separations, based on parentage.

25       **THE COURT:**  Based upon the responses you've gotten so

 1    far and the representations in their response, I'm prepared to

 2    accept them, and I'm prepared to revisit that if you give me

 3    some basis to do that, based on discovery you take.

 4            **MR. GELERNT:**  Okay.

 5            **THE COURT:**  So, for example, when you depose

 6    Mr. Mario -- so I won't say his last name -- right? -- if

 7    something else comes out in that deposition that is pointing

 8    you in a broader direction, great.  Come back to me.  That's

 9    the first thing.  So I'll table that.

10        The second thing is you can also, in the meantime, since

11    you have possession of those documents -- right? -- the

12    argument you're making to let you use the documents I already

13    have will be more compelling, if I was the judge in that case,

14    because you're saying I've got to keep (Inaudible) San Diego,

15    who's a different time -- but I think it -- I would like to --

16    because it gets the same government documents they know

17    about -- right? -- led me to review them in connection with

18    that case.  I -- if I was the judge, I would be very open to

19    that argument.

20        So in the meantime, do that because if the judge agrees

21    with the broader -- because the broader principle here is -- I

22    get it.  From an evidentiary point of view, you had possession

23    of things.  And even if they don't directly relate to this

24    child, they paint a picture of what was going on; right?

25        And so the judge in Florida is just honing in on this case

```
 1   in a very myopic way (Inaudible); right?  Or her.  I'm sorry.

 2   I know what judge it is.  And then that judge may be more

 3   (Inaudible).  I'll grant you an exception to my protective

 4   order that allows you to look at it for purposes of this case

 5   without using it or something like that.

 6        Do that in the meantime because I actually -- if I was

 7   that judge, I think I'd be pretty amenable to doing that

 8   because you already produced those documents, and you're coming

 9   in and saying, "I'm not trying to use it for something other

10   than the type of litigation like this."  So do that in the

11   meantime.  You may find that that solves your immediate

12   problem, Number 1.

13        And, Number 2, alternatively, in the discovery that you're

14   already planning on taking and working on getting, based upon

15   this -- these documents, other facts may come out that would

16   bolster what you're saying -- what you're telling me now, and

17   then I can revisit it because -- especially if I now know --

18   you just told me, "I actually have them."

19        Now, I get -- all right.  So I have -- I can easily change

20   my order and help you; right?  So let's just take it a step at

21   a time --

22             MR. GELERNT:  Okay, Your Honor.

23             THE COURT:  -- because it's --

24             MR. GELERNT:  Fair enough.

25             THE COURT:  -- because that, I think, would be better
```

```
 1    in terms of my record and more consistent with how I normally

 2    do it.

 3         When's our trial date?

 4             MR. GELERNT:  The trial is in April, but the discovery

 5    cutoff, to accommodate the AUSA's schedule, is -- the AUSA

 6    wants to take ten weeks off, starting in October -- end of

 7    October.  We would be amenable to moving the discovery date --

 8             THE COURT:  You're going somewhere?

 9             MR. LEINICKE:  Your Honor, I was just blessed with the

10    birth -- birth of our first kid.

11             THE COURT:  I've heard, yeah.

12             MR. LEINICKE:  I --

13             THE COURT:  Oh.  This is a delayed paternity?

14             MR. LEINICKE:  That's correct.

15             THE COURT:  Oh.

16         Okay.  The --

17             MR. GELERNT:  We are amenable to pushing discovery out

18    to January.

19             THE COURT:  Did -- and just -- and Judge Williams may

20    very well be willing to do that, especially if you're having

21    issues finding former officials --

22             MR. GELERNT:  Right.

23             THE COURT:  -- because they're no longer in control of

24    the Government.  The Government can't just produce them.

25             MR. GELERNT:  Well --
```

1          **THE COURT:**  And there may people -- there may be

2     people that are doing many different things.

3          **MR. GELERNT:**  Yeah, absolutely.

4        And just on that point -- I don't want to belabor it, but

5     in all the other family separation cases, Main Justice finds

6     the former employees for plaintiffs in a week, maximum -- and

7     that's unusual -- two weeks, facilitates the dates and

8     locations.  We're not --

9          **THE COURT:**  But have they given you addresses?  Have

10    they given you contact information?

11         **MR. GELERNT:**  They -- and these are other cases we

12    know about and not my case.

13         **THE COURT:**  I mean, in your case, did they give you

14    contact information?

15         **MR. GELERNT:**  In this case?

16         **THE COURT:**  Yeah.

17         **MR. GELERNT:**  No.

18         **THE COURT:**  Oh.

19         **MR. GELERNT:**  We are -- we are doing private

20    investigators to try and to find people.

21         **THE COURT:**  Well, I can help you there.  Why aren't

22    you asking me to give you -- have -- compel them to give you

23    the contact information?

24         **MR. GELERNT:**  Thank you, Your Honor.

25        We would respectfully request that.

```
 1            THE COURT:  In other words, you've represented that
 2    you've done an initial review, and it's having -- you're having
 3    a hard time finding them.
 4            MR. GELERNT:  I mean, it's time-consuming, and it
 5    costs money.  And so --
 6            THE COURT:  Okay.
 7            MR. GELERNT:  -- I think what the AUSA knows is that
 8    he can go to Main Justice, and Main Justice can help because
 9    Main Justice finds people quickly.  And so --
10            THE COURT:  I'm not going to compel him to find them,
11    but I -- I do -- I do have -- is there a reason why you -- the
12    Government can't disclose -- obviously, if the Government wants
13    to produce them, that's one thing.
14        But if the Government -- if they're no longer employees,
15    doesn't he have to know their last contact information?
16            MR. LEINICKE:  Your Honor, I have -- for certain
17    employees, I have been able to contact them, and we have
18    negotiated that I can accept on their behalf.
19            THE COURT:  Okay.
20            MR. LEINICKE:  For other -- for other employees, one
21    of the defendant agency -- well, one of the agencies just has
22    not given me the -- the last known contact information.
23            THE COURT:  Well, don't you need my help for that?  I
24    can give you an order.
25            MR. LEINICKE:  If the Court would be so inclined.
```

1    **THE COURT:**  Yeah, absolutely.

2    So -- so work out which ones you're talking about.

3    Obviously, if they've already arranged for them, then -- there

4    are security issues.  These are -- some of these people are law

5    enforcement.  So if there are security issues, obviously, I --

6    I respect that.

7    But to the extent that they haven't otherwise given you

8    contact information, then they have to -- they can do the

9    contacting first.  Obviously, that's what Mr. Leinicke is

10   talking about.

11   **MR. GELERNT:**  And that's what Main Justice is doing.

12   **THE COURT:**  That's fine.

13   As to anybody else that you need that are revealed in

14   these communications, if they haven't been able to do that,

15   give me an order, and I'll compel them to produce that.

16   **MR. GELERNT:**  Thank you, Your Honor.

17   **THE COURT:**  Okay.

18   **MR. GELERNT:**  That would be great.

19   **THE COURT:**  Okay.  So we'll start there, and then

20   let's see where we are after that process.

21   And in terms of the discovery schedule, given Counsel's

22   situation, you know -- what is our cutoff right now?

23   **MR. LEINICKE:**  October 25th, Your Honor.

24   **THE COURT:**  Oh.  Okay.  You're going to need an

25   extension, but I'm going to -- you can cite this order --

```
 1    this -- this --
 2              MR. GELERNT:  Okay.
 3              THE COURT:  -- this process, and Judge Williams has
 4    generally been amenable when good cause is shown.  So I think
 5    you have good cause.  So --
 6              MR. GELERNT:  Okay.
 7              THE COURT:  Okay.  And then -- because it sounds like
 8    you're not starting depositions on -- you've only -- you've
 9    only got a handful of people lined up in September; right?
10              MR. GELERNT:  That's right, Your Honor.
11              THE COURT:  Yeah.
12         Okay.  All right.  I think that's fair.
13              MR. GELERNT:  Thank you, Your Honor.
14              THE COURT:  Okay.  All right.  So I'll table
15    everything else once we do that initial round, and then you can
16    come back to me.  Alternatively, if you get an order from the
17    judge in Arizona, then that may solve that issue.
18              MR. GELERNT:  So -- and, Your Honor, I don't know
19    whether you -- we have some other RFPs that are not being
20    answered, that are much more limited in scope.
21              THE COURT:  Okay.
22              MR. GELERNT:  And they're -- we've put those in the
23    notice of compliance, but I -- if you would like me to address
24    those quickly here, I can do that.
25              THE COURT:  Yeah.  You still have -- you still have
```

```
 1   five minutes, so yeah.
 2        And then does the -- does the Government have an issue?
 3        MR. LEINICKE:  Yes, Your Honor.  There's a very
 4   significant issue related to tomorrow's Rule 35 examination of
 5   the child.
 6        THE COURT:  Oh.  Okay.  What's that?
 7        We'll table your issue for a second.
 8        MR. LEINICKE:  So -- so as we speak right now, the
 9   Government's psych- -- psychiatrist is examining the father,
10   Mr. Matute Castro, at the offices of American Immigrant
11   Justice.
12        THE COURT:  Okay.
13        MR. LEINICKE:  Tomorrow, the son is scheduled for his
14   own examination.
15        THE COURT:  How old is the son now?
16        MR. LEINICKE:  I believe he's eight years old now.
17        So the parties have agreed, in principle, that a Rule 35
18   dep- -- examination should go forward.  However, some of the
19   issues as to the scope of the exam are in contention.
20        The primary issues are, one -- so it's the length of the
21   exam, the attendance or observation of the mother, who is a
22   nonparty.  So Mrs. Ramirez is -- is R.Y.M.R.'s mother and the
23   plaintiff father's wife.  And then, as well, Number 3, whether
24   the examination can be recorded by audio means.
25        As to the first point, which is the length of the
```

 1   examination, I have been able to work out with Dr. Cortes, who

 2   is our expert, that she should be able to complete the exam in

 3   a total of six hours.  The plaintiffs are saying that five --

 4   no more than five is appropriate.

 5          **THE COURT:**  You get the six.

 6      What's the next issue?

 7          **MR. LEINICKE:**  Okay.  The next issue is the presence

 8   of R.Y.M.R.'s mother in the exam.  We have tabled the issue of

 9   whether or not my expert --

10          **THE COURT:**  Given -- given the length of time that

11   he'd be involved with an eight-year-old, don't you think it's

12   kind of --

13          **MR. LEINICKE:**  It's not -- no.  Just to -- again, to

14   be clear, Your Honor, we do not object to the mother's presence

15   at least for a portion of the exam.  The issue, I think, comes

16   down to, you know, the plaintiffs have resisted -- and I

17   understand their position -- an interview.

18      So in a normal -- in a normal exam, Dr. Cortes would

19   interview both -- all significant caregivers to the child.

20   And, indeed, their expert had a three-hour interview combined

21   with Mrs. Ramirez.  Now, they have resisted an interview

22   because, under Rule 35, the position is -- is that we can't

23   compel her to the interview, and I -- I understand that.

24      But in terms of -- we want to make sure that there -- that

25   while Mrs. Ramirez's presence at the dep- -- at the examination

1  for, you know, one to two hours -- that we're not -- the

2  examination isn't going off the rails if -- if we're at -- if

3  my -- my interviewer asks her a question or, you know, asks

4  her -- asks Mrs. Ramirez, you know, kind of just general --

5          **THE COURT:**  So, just to cut to the chase, your expert

6  wants to be able to ask questions of Mrs. Ramirez?

7          **MR. LEINICKE:**  Yes.

8          **THE COURT:**  All right.  What's the problem with that?

9          **MR. GELERNT:**  Well, Rule 35 -- he's going to get to

10  depose Ms. Ramirez, but Ms. Ramirez is not a party, and Rule 35

11  only applies to parties.

12          **THE COURT:**  But for purposes of -- I understand that.

13  But -- but given that we have a psychological examination of a

14  child, Number 1, I would agree that the mother probably needs

15  to be present for the benefit of the exam, especially if the

16  exam goes for an extended period.

17          But, Number 2, it would be consistent with my own practice

18  for the -- for the examining person to inquire because,

19  obviously, the issue is what's the condition of the child;

20  right?  What damage has been suffered?  What continuing damage

21  has been suffered?  You know, questions from the -- in a

22  nonadversarial setting from the -- from my -- from a

23  psychologist to the mother makes perfect sense; right?

24          And if the mother is otherwise attending anyway --

25  right? -- she's there with the child, to be there for her

```
 1    child, and so the child feels comfort in the process, it
 2    doesn't feel like the child -- you know, I'm perfectly fine
 3    with having the mother there to facilitate their exam because
 4    the child may be in a -- in a traumatic situation with an
 5    extended separation from the mother.
 6        So it makes perfect sense.  The only issue is, in the
 7    context of that exam, whether I should preclude the examiner
 8    from asking the mother, who's in the room, for information
 9    relevant to the condition of the child.  What's -- what's wrong
10    with that?
11            MR. GELERNT:  Well, Your Honor, we have never actually
12    seen that in a Rule 35, but we -- and we understand
13    Your Honor's position.
14            THE COURT:  Well, normally, I don't allow people's
15    mothers in a Rule 35, either, but this is an eight-year-old
16    child.
17            MR. GELERNT:  Well, right.  Your Honor, I think
18    that -- that's a fair (Inaudible) if the mother can be in there
19    the whole time.
20            THE COURT:  Yeah.
21            MR. GELERNT:  The other thing we have suggested -- and
22    we're not really sure why the Government is objecting because
23    our expert from Johns Hopkins, who specifically does this
24    work -- we have suggested that there be a tape recorder,
25    nonobtrusive.  It's -- I mean, you can't really see this --
```

```
 1          THE COURT:  Do you --

 2          MR. GELERNT:  -- but it's literally three --

 3          THE COURT:  Do you have a -- do you have a video of

 4    your expert?

 5          MR. GELERNT:  No.  We weren't asked for it, but there

 6    were people in the room.  There were other people in the room.

 7          THE COURT:  Why did the -- why does the Government

 8    have to be in a different position than your expert?

 9          MR. GELERNT:  Well, I think -- I mean, two things,

10    Your Honor.  One is the Government didn't ask, but the second

11    thing is our expert was not in the room with the child by

12    himself.  He had a medical student and a translator, and so I

13    think that's the difference.

14       And I think the Government also -- you know, the child

15    knows that the Government took him away.

16          THE COURT:  But I'm granting your request to have the

17    mother present.

18          MR. GELERNT:  Okay, Your Honor.

19          THE COURT:  So you have a witness, too, the mother.

20    If -- let's assume Judge -- Dr. Cortes went off the rails for

21    some reason; right?  The mother is there.  They need to be with

22    the child and be -- to be able to testify in court they

23    shouldn't believe Dr. Cortes because of A, B, and C; right?

24       So you're going to have somebody there to do that.

25          MR. GELERNT:  That's --
```

```
1        THE COURT:  So -- so --

2        MR. GELERNT:  That's fair, Your Honor.

3    The only thing I would say is that I think the mother will

4    not be sufficiently familiar with all of this battery of tests

5    to be able to say, "Well, the test didn't" -- "wasn't" --

6        THE COURT:  But have your -- have your expert explain

7    it to her because I think your expert probably ran the same

8    kind of tests.

9    So have your expert talk to her today, early in the

10   morning, and then that way -- to inform her what's going on, so

11   she's not alarmed.  Your expert knows what they're going to do,

12   and then she'll be allowed to be present.  Okay?

13       MR. GELERNT:  Okay, Your Honor.  So --

14       THE COURT:  So six hours, mother present, mother can

15   be asked questions --

16       MR. GELERNT:  Your Honor --

17       THE COURT:  -- no -- no videotaping.

18       MR. GELERNT:  Yeah.

19       THE COURT:  What's your issue -- what's your issue

20   before I let you go?  Did you have another --

21       MR. GELERNT:  I was just going to say that the five

22   wasn't arbitrary.  It's what our doctor got.  He got three and

23   a half with the child and the five hours total with the mother

24   was in -- you know?

25   Anyway -- but let me -- let me drop that.
```

```
 1            THE COURT:  Yeah.

 2            MR. GELERNT:  If there's no time for the rest of the

 3   discovery, it's in our papers.  They're much more narrow.

 4            THE COURT:  Is there something, though -- no.  Go

 5   ahead.  Let me give you five more minutes.  Is there something,

 6   in particular, that you -- other than what we've already talked

 7   about, that you want me to -- to compel now?  Not later, now.

 8            MR. GELERNT:  Yeah.  I think Number 37, RFP 37 --

 9            THE COURT:  Okay.

10            MR. GELERNT:  -- which is at Page 11 of the exhibit.

11            THE COURT:  Okay.  I've got it.

12            MR. GELERNT:  So the Government's position is, as

13   you've heard -- is that what the San Diego office was doing in

14   trying --

15            THE COURT:  I've covered this one, though.

16            MR. GELERNT:  37?

17            THE COURT:  Yeah.  I was including this in my --

18            MR. GELERNT:  Oh.

19            THE COURT:  I saw this one.

20            MR. GELERNT:  Because the reason we think this is

21   different is because the Government is saying they were just

22   following the national policy on authentication in family

23   relationships.

24        But given that 80 percent of all these parentage doubt

25   cases came from San Diego, we doubt that the other regions of
```

1 the country had the same understanding of the national policy,

2 and so we think that's why that would be significant to know.

3 That's not a national policy --

4       **THE COURT:**  I -- I considered this the same because I

5 had -- I was looking at this one a lot because their answer to

6 you from (Inaudible) was nothing was found at San Diego within

7 the relevant time frame.  And your question goes to policies,

8 procedures, training manuals regarding the verification of

9 parentage or legal guardianship.

10      **MR. GELERNT:**  But these ask for the local policies in

11 each region.

12    So to the extent San Diego put their policy in writing and

13 other regions did and San Diego claims they were just -- "This

14 is what we were told," if every other region in the country had

15 a different way of verifying parentage, that would be

16 significant for us to know, irrespective of whether this

17 connected to the larger Trump Administration separation

18 policies.

19       **THE COURT:**  Oh, I see.

20      **MR. GELERNT:**  So the Government --

21       **THE COURT:**  I see.

22    You want -- you want to be able to compare what they

23 produced for San Diego with another area.

24      **MR. GELERNT:**  So the Government -- right.  The

25 Government is saying, "In San Diego, we wouldn't accept a

```
 1    copy," but if every other region in the country accepted a

 2    copy, that suggests that San Diego was not properly

 3    interpreting --

 4            THE COURT:  I understand.

 5        So if he identifies a couple other regions to produce, if

 6    there are any different policies, is there a problem with that,

 7    Mr. Leinicke?

 8        In other words, what he's saying is, to rebut the

 9    documents that you've produced here, he wants to be able to

10    show the jury or Judge Williams the El Paso policies to

11    contrast them.

12            MR. LEINICKE:  Well, just to be -- so, first, the

13    request -- the ask for CBP, I think, again, is clearly not

14    relevant because --

15            THE COURT:  Well, I'm talking about ICE.  I'm talking

16    about ICE -- ICE and HHS.

17        Now, ICE said everything from San Diego -- nothing was

18    found, and HHS said all policies have been produced.  I take

19    it, in that email chain, there's a specific attachment of a --

20    either a policy manual or a -- or a training document that was

21    circulated among those principals as to what they should be

22    looking for.

23            MR. LEINICKE:  Yes.  That's the local policy from ICE,

24    correct.

25            THE COURT:  What he is asking for is for that type of
```

1   document from that -- that was found in another sector.

2          **MR. GELERNT:**  And we can narrow the number of sectors.

3          **THE COURT:**  Assuming he narrowed it, to compare, to

4   show that the Government was using inconsistent rules and, for

5   some reason, San Diego wasn't following what El Paso was doing,

6   for example.

7          **MR. LEINICKE:**  Again, Your Honor, I -- it just doesn't

8   appear that that's relevant to the claims at issue here.

9          **THE COURT:**  Why wouldn't it be circumstantial evidence

10  to show that San -- there was something wrong with San Diego?

11         **MR. LEINICKE:**  That San Diego was going off on a wild

12  tear --

13         **THE COURT:**  Right.

14         **MR. LEINICKE:**  -- or --

15         **THE COURT:**  Right, circumstantial evidence that they

16  were doing -- that they -- that they were basically not --

17  either not following national policy or otherwise engaging in

18  arbitrary, capricious behavior.

19         **MR. LEINICKE:**  But, Your Honor, we have produced the

20  national policy itself, which was the PBNDS --

21         **THE COURT:**  Uh-huh.

22         **MR. LEINICKE:**  -- and then the local policy as well --

23         **THE COURT:**  Oh.

24         **MR. LEINICKE:**  -- of the ICE -- of the San Diego

25  Sector, and the plaintiffs have the ability -- so -- so they

1   know what the policy is for the relevant area in question.

2       What other -- how other localities did or did not change

3   or have their own local analysis would appear to be irrelevant

4   as to whether there was -- whether the -- the policy at issue

5   is lawful, consistent with the -- consistent with the national

6   policy or not.

7       I don't think -- again, I just don't see how --

8           **THE COURT:**  It could be circumstantial evidence,

9   though, to show that it was arbitrary; right?  In other words,

10  if every other -- if every other sector was using a very

11  different policy with respect to --

12          **MR. LEINICKE:**  Uh-huh.

13          **THE COURT:**  -- for example, getting copies of a birth

14  certificate for a child; right?

15      Because the communications here suggests that one of the

16  reasons they separated was because only the father had papers,

17  not the child.  And so, therefore, they can't know for certain

18  that it's some kind of coyote bringing a kid, as opposed to the

19  real father; right?

20      Is that the point?

21          **MR. LEINICKE:**  Well -- but, again, the point,

22  Your Honor, is that -- what does this have to do with proving

23  the elements of their causes of action?  Which of their causes

24  of action could this -- could this relate to?

25          **THE COURT:**  Well, it would go to the recklessness of

```
 1   the battery or the assault, I guess.  That would be the

 2   argument; right?

 3            MR. LEINICKE:  That the -- well -- but -- so,

 4   Your Honor, the plaintiffs weren't actually injured in the

 5   assault.

 6            THE COURT:  Well, they're claiming they were.

 7            MR. LEINICKE:  No, they're not actually, Your Honor.

 8            THE COURT:  They're not claiming an injury to the

 9   child?

10            MR. LEINICKE:  That's correct.

11      We -- in their interrogatories --

12            THE COURT:  You're not claiming an injury to the

13   child?

14            MR. GELERNT:  The core -- that's the whole case

15   Your Honor, that separating this child caused massive trauma.

16            MR. LEINICKE:  They're claiming only that there was a

17   psychic injury --

18            THE COURT:  Well, that's an injury.

19            MR. LEINICKE:  -- a mental -- a mental injury.

20      Well --

21            THE COURT:  That's an injury; right?

22            MR. LEINICKE:  But, again, how does that relate -- the

23   fact that the child was separated is not in contention.

24            THE COURT:  Right.

25            MR. LEINICKE:  So what is the -- the intent of the
```

```
1   officer is not relevant to a claim for -- and no one is -- and

2   it's not disputed that the officers intended to separate them;

3   right?

4          THE COURT:  Uh-huh.

5          MR. LEINICKE:  So I'm not seeing how the -- the

6   controlling policy is the -- you know, is relevant to -- to the

7   assault because it's -- it's not in contention that -- that the

8   officers separated -- you know, separated or -- separated the

9   family.

10         THE COURT:  Uh-huh.

11         MR. LEINICKE:  I'm sorry, Your Honor.  I just am not

12  understanding -- -standing the argument.

13         MR. GELERNT:  Well, the whole case is about whether

14  the separation was lawful.  They produced national policies

15  that said, "Separate if it's not a family relationship."

16         THE COURT:  Right.

17         MR. GELERNT:  San Diego has said, "We're going to

18  separate if it's only a copy of a birth certificate."  If the

19  other sectors we give say, "We don't do that," then that

20  suggests there's something reckless about taking a child away

21  with a copy.

22      Why would they interpret national policy differently?

23  Something is funky here, and --

24         THE COURT:  I agree --

25         MR. GELERNT:  -- we'll limit it to a few sectors.
```

1       **THE COURT:**  I agree with you.  Limit it to three

2  sectors, in addition to San Diego, and I'm talking about

3  literally just training materials; right?  You're -- not all

4  documents related to --

5       **MR. GELERNT:**  Or formal policies.

6       **THE COURT:**  Not all communications to training

7  materials that were circulated within that sector.

8       **MR. GELERNT:**  Your Honor, that's -- that's fair.

9       **THE COURT:**  That -- I'll grant that -- I'll grant that

10  as to Number 37 in part.

11       **MR. GELERNT:**  I just wanted to say one thing,

12  Your Honor.

13       **THE COURT:**  Yeah.

14       **MR. GELERNT:**  In San Diego, they're claiming CBP has

15  nothing to do with separation.  We still haven't gotten through

16  the depositions to know if that's true.

17       **THE COURT:**  All right.

18       **MR. GELERNT:**  But it's -- it's undisputed -- I think,

19  if Main Justice were here, they would tell you in a heartbeat

20  CBP does it in other sectors.

21       So if we could pick those three sectors, only the training

22  materials of CBP and ICE, I think that would be -- that would

23  be fair.

24       **THE COURT:**  I'm -- I'm granting you training materials

25  related to Number 37 --

1          **MR. GELERNT:**  Okay.  Thank you, Your Honor.

2          **THE COURT:**  -- right? -- for three other sectors

3    during the relevant time period identified -- actually, the

4    relevant time period would be -- I see why you picked 2017 to

5    '21.  So I'm going to limit -- I'm going to limit the time

6    period --

7          **MR. GELERNT:**  We've -- we've limited it to -- to the

8    date of the injunction by Judge Sabraw.

9          **THE COURT:**  Fine.

10       And then as to three other sectors, but not all documents,

11   just the training materials.

12         **MR. LEINICKE:**  And only for ICE, Your Honor, as CBP

13   did not do this separation?

14         **THE COURT:**  Well -- well, basically, here -- well, if

15   there was a -- and the reason you're saying CBP did not do the

16   separation is because the officer -- the customs officer or

17   Border Patrol agent said that he -- he basically handed off the

18   child to ICE, and when he left his custody, the child was still

19   with the father.

20       Is that what you're saying?

21         **MR. LEINICKE:**  And we have all of the ICE discovery

22   that details -- I mean, that's what these emails are.  These

23   emails are from ICE ERO agents saying, "These people are in our

24   custody.  Should we separate them?"

25       "Yes, we're separating them."

```
 1              THE COURT:  Right.

 2              MR. LEINICKE:  So it's not just -- I don't think it's

 3  reasonably in dispute, Your Honor, that CBP --

 4              MR. GELERNT:  We're not disputing that ICE did the

 5  separation in this case.

 6              THE COURT:  Okay.

 7              MR. GELERNT:  All I'm saying is that the question of

 8  whether copies of birth certificates is a general issue.  Some

 9  sectors decide CBP will do the separations.  Most do actually.

10  Some decide that ICE will.  So it's just relevant to know what

11  training materials those three sectors, CBP or ICE, got about

12  authentication.

13              THE COURT:  Well, for purposes of this request, I'm

14  compelling ICE and HHS because those are the ones who are

15  identified having responsive documents to 37 already.  So I'm

16  extending 37, then, to three other sectors that you identify

17  for the relevant time period.

18              MR. GELERNT:  And not CBP in those sectors?

19              THE COURT:  Not -- not CBP.

20              MR. GELERNT:  Because if it turns out those sectors

21  say, "Well, CBP does all the authentication" --

22              THE COURT:  I'm also trying to get you documents

23  relatively quickly, and so one less agency that he has to go to

24  would be helpful.

25              MR. GELERNT:  It would take them -- I'm just concerned
```

```
 1    that -- I know that, in other sectors, it's CBP who does the
 2    authentication.  So their training materials would be the ones
 3    that are relevant.
 4         THE COURT:  Clearly, though, ICE training materials
 5    would have been -- would be the first place they would get any
 6    of those materials.  So by giving you ICE materials, you're
 7    getting the materials as a practical matter.
 8         MR. GELERNT:  Maybe.  Maybe CBP has their own.  You
 9    know, it depends on how each sector is set up, but why don't we
10    start with --
11         THE COURT:  I get it.  We'll start with ICE.
12    Okay.  So I'll compel that.
13         MR. LEINICKE:  May I --
14         THE COURT:  So we're clear on the 35 request; right?
15         MR. GELERNT:  Yes, Your Honor.
16         THE COURT:  We're clear on that?  Because that's
17    tomorrow.
18         MR. LEINICKE:  No.  I'm sorry, Your Honor.
19         THE COURT:  No?
20         MR. LEINICKE:  I want to make -- so the issue of
21    mother's attendance.
22    My -- my expert, Dr. Cortes, says that it's important, for
23    at least a portion of the exam, for the mother to be -- to have
24    only R.Y.M.R. in the room, for it to be a one-on-one exam.
25    So what we -- where we had last left off, but prior to
```

```
 1   arriving, was that mom would be there for approximately one and
 2   a half to two hours at the beginning.  And then, for the
 3   remainder of the exam, it would be just R.Y.M.R. and Dr. Cortes
 4   in the room together.
 5            THE COURT:  Well, let me do it this way.  I don't know
 6   that -- especially since it's tomorrow; right?
 7            MR. LEINICKE:  Yes.
 8            THE COURT:  I'm going to let the -- I'm going to --
 9   you've asked for a six-hour examination.  I'm going to let the
10   mother be there.  If, later on, you -- something -- she cannot
11   get good data because the mother was there, then you can come
12   back to me, and then I can do a much narrower thing.
13            MR. LEINICKE:  Okay.
14            THE COURT:  You see my point?
15            MR. LEINICKE:  Thank you, Your Honor.
16            THE COURT:  That's the -- that's the downside of me
17   doing that from their point of view.  I'd rather do that,
18   especially if you're telling me it's tomorrow.
19        I'm going to let the mother be there tomorrow.  If
20   Dr. Cortes comes back and says, "I needed" -- "I needed an hour
21   alone, and here's why," I'll hear you.  And, if necessary, I'll
22   order another examination.  Okay?
23            MR. LEINICKE:  Thank you, Your Honor.
24            THE COURT:  Okay.  That's all I can get to today.  So
25   everything else is tabled.
```

```
 1              MR. GELERNT:  Thank you, Your Honor.

 2              THE COURT:  Thank you.

 3                   (Proceedings adjourned at 2:43 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                  **CERTIFICATE OF TRANSCRIBER**

4           I certify that the foregoing is a true and correct

5    transcript, to the best of my ability, of the above pages of

6    the official electronic sound recording provided to me by the

7    U.S. District Court, Southern District of Florida, of the

8    proceedings taken on the date and time previously stated in the

9    above matter.

10          I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties to the action in

12   which this hearing was taken, and further that I am not

13   financially nor otherwise interested in the outcome of the

14   action.

15

16   DATE:  Monday, October 31, 2022

17

18

19

20           /S/ James C. Pence-Aviles

21      James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                    U.S. Court Reporter
22

23

24

25