Lee Gelernt*
Daniel Galindo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.:  (212) 549-2660
Fax:  (212) 549-2654
*lgelernt@aclu.org*
*dgalindo@aclu.org*

Ian M. Ross (Fla. Bar No. 091214)
Carmen M. Ortega-Rivero (Fla. Bar No.
1025996)
SIDLEY AUSTIN LLP
1001 Brickell Bay Avenue, Suite 900
Miami, FL 33131
Tel.:  (305) 391-5100
Fax:  (305) 391-5101
*iross@sidley.com*
*cortegarivero@sidley.com*

*Attorneys for Plaintiffs*
(Additional counsel listed on signature page)
*Admitted Pro Hac Vice

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| ERIC MATUTE CASTRO, on his own behalf and as the representative of his minor son, R.Y.M.R., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No. 1:20-cv-23598-KMW-EGT <br><br> **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................1

SCOPE OF PLAINTIFFS' MOTION .........................................................................................2

STATEMENT OF FACTS ...........................................................................................................3

    A.    Plaintiffs' Separation ...................................................................................3

    B.    R.Y.M.R. Was Taken from His Father Without *Any* Investigation........................4

    C.    Plaintiffs' Separation Was Based on a Single Incorrect Fact ..................................6

    D.    Systemic ICE San Diego Issues ...............................................................................8

LEGAL STANDARD....................................................................................................................8

ARGUMENT .................................................................................................................................9

II.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR NEGLIGENCE CLAIM .................................................................................................9

    A.    Defendant Owed Plaintiffs a Heightened Duty of Care...........................................9

    B.    Defendant Breached Its Heightened Duty of Care to Plaintiffs.............................10

III.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR IIED CLAIM............................................................................................................................12

    A.    Defendant's Conduct Was Extreme and Outrageous............................................12

    B.    Defendant Acted with Reckless Disregard of the Probability that Plaintiffs Would Suffer Emotional Distress. ........................................................................14

IV.    THE FEDERAL TORT CLAIMS ACT WAIVES DEFENDANT'S SOVEREIGN IMMUNITY.....................................................................................................................15

    A.    The Discretionary Function Exception Does Not Apply Here ..............................16

    B.    The Due Care Exception Does Not Apply Here.....................................................19

    C.    Plaintiffs' Tort Claims Satisfy the Broad Private Analogue Inquiry....................20

CONCLUSION............................................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.E.S.E. v. United States*,
  No. 21-cv-0569, 2022 WL 4289930 (D.N.M. Sept. 16, 2022)................................20

*A.F.P. v. United States*,
  No. 21-cv-00780, 2022 WL 2704570 (E.D. Cal. July 12, 2022)............................9

*A.P.F. v. United States*,
  492 F. Supp. 3d. 989 (D. Ariz. 2020) ......................................................19

*S.R.P. ex rel. Abunabba v. United States*,
  676 F.3d 329 (3d Cir. 2012)................................................................18

*Agarwal v. Johnson*,
  25 Cal. 3d 932 (Cal. 1979)................................................................12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................8

*Appley Bros. v. United States*,
  164 F.3d 1164 (8th Cir. 1999) ..............................................................17

*ARA Leisure Servs. v. United States*,
  831 F.2d 193 (9th Cir.1987)................................................................18

*Brown v. USA Taekwondo*,
  483 P.3d 159 (Cal. 2021) ...................................................................9

*Burgess v. Superior Ct.*,
  831 P.2d 1197 (Cal. 1992) (en banc) .......................................................9

*C.M. v. United States*,
  No. 19-cv-05217, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020)...............................9

*C.M. v. United States*,
  No. 5:21-CV-0234, 2023 WL 3261612 (W.D. Tex. May 4, 2023) .........................20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................8

*Conroy v. Perez*,
  64 Cal. App. 2d 217 (1963) ................................................................10

*Coulthurst v. United States,*
    214 F.3d 106 (2d Cir. 2000)................................................................18

*Creedle v. Miami-Dade Cnty.,*
    No. 17-CIV-22477, 2019 WL 5212420 (S.D. Fla. June 14, 2019)........................19

*Crumpton v. Stone,*
    59 F.3d 1400 (D.C. Cir. 1995)............................................................19

*Douglas v. United States,*
    814 F.3d 1268 (11th Cir. 2016) ..........................................................16

*Edison v. United States,*
    822 F.3d 510 (9th Cir. 2016) ...........................................................9, 10

*Fleming v. United States,*
    69 F. Supp. 2d 837 (W.D. Va. 1999) .....................................................18

*United States v. Gaubert,*
    499 U.S. 315 (1991)..............................................................16, 17, 18

*Giraldo v. Cal. Dep't of Corrs. & Rehab.,*
    168 Cal. App. 4th 231 (2008) ........................................................9, 10, 14

*Hatahley v. United States,*
    351 U.S. 173 (1956)......................................................................20

*Hickson Corp. v. N. Crossarm Co., Inc.,*
    357 F.3d 1256 (11th Cir. 2004) ...........................................................8

*Hilyar v. Union Ice Co.,*
    45 Cal. 2d 30 (1955) ....................................................................10

*Holden v. Target Corp.,*
    No. 16-cv-02217, 2016 WL 3938950 (N.D. Cal. July 21, 2016) ...........................13

*Hughes v. Pair,*
    46 Cal. 4th 1035 (Cal. 2009)............................................................12

*Indian Towing Co. v. United States,*
    350 U.S. 61 (1955)......................................................................18

*Kajtazi v. Kajtazi,*
    488 F. Supp. 15 (E.D.N.Y. 1978) ........................................................13

*Katsaris* v. *Cook,*
    180 Cal. App. 3d 256 (Cal. Ct. App. 1986) ..............................................15

*KOVR-TV, Inc.* v. *Superior Ct.*,
  31 Cal. App. 4th 1023 (Ct. App. 1995)..................................................................15

*Kunz v. Deitch*,
  660 F. Supp. 679 (N.D. Ill. 1987) ........................................................................13

*Latele Television, C.A. v. Telemundo Comm. Grp., LLC*,
  No. 12-cv-22539, 2015 WL 427817 (S.D. Fla. Feb. 2, 2015) ..................................8

*Lawson v. Superior Ct.*,
  180 Cal. App. 4th 1372 (2010) .............................................................................9

*In re Marilyn H.*,
  5 Cal. 4th 295 (Cal. 1993)...................................................................................20

*Miles v. Naval Aviation Museum Found., Inc.*,
  289 F.3d 715 (11th Cir. 2002) .............................................................................18

*Ms. L. v. U.S. Immig. and Customs Enforcement*,
  310 F. Supp. 3d 1133 (S.D. Cal. 2018).................................................................14

*Ochran v. United States*,
  117 F.3d 495 (11th Cir. 1997) .............................................................................18

*United States v. Olson*,
  546 U.S. 43 (2005)..............................................................................................20

*Pankratz* v. *Willis*,
  744 P.2d 1182 (Ct. App. Ariz. 1987) ...................................................................12

*Potter v. Firestone Tire & Rubber Co.*,
  863 P.2d 795 (Cal. 1993) ......................................................................................9

*Sheltra v. Smith*,
  392 A.2d 431 (Vt. 1978) .....................................................................................13

*Shivers v. United States*,
  1 F.4th 924 (11th Cir. 2021) ...............................................................................17

*Surina v. Lucey*,
  168 Cal. App. 3d 539 (Ct. App. 1985)..................................................................20

*Swafford v. United States*,
  839 F.3d 1365 (11th Cir. 2016) ...........................................................................18

*Turnbull v. United States*,
  No. 1:06CV858, 2007 WL 2153279 (N.D. Ohio July 23, 2007)............................12

*W.S.R.* v. *Sessions*,
    318 F. Supp. 3d 1116 (N.D. Ill. 2018) .................................................................................14

*Weisman* v. *County of Los Angeles*,
    No. CV 12–10207 SJO, 2013 WL 12202779 (C.D. Cal. Sept. 5, 2013) ................................13

*White v. Ultramar, Inc.*,
    603 P.2d 58 (Cal. 1999) .........................................................................................................12

**Statutes**

28 U.S.C. § 2674 .......................................................................................................................16

28 U.S.C. § 2680(a) ...........................................................................................................16, 19, 20

Federal Tort Claims Act.......................................................................................................16, 17, 18

**Other Authorities**

Fed. R. Civ. P. 56 ......................................................................................................................8, 12

Restatement (Second) of Torts § 46 (Am. L. Inst. 1965) .............................................................12

Fed. R. Civ. P. 30(b)(6)...........................................................................................................6, 7, 8

## PRELIMINARY STATEMENT

Plaintiffs, Eric Matute Castro and R.Y.M.R., are a Honduran asylum-seeking father and son who, upon arrival at the U.S.-Mexico border in November 2017, were separated by U.S. government officials based on purported doubts that Mr. Matute was R.Y.M.R.'s father. When he was separated, R.Y.M.R. was three years old and screamed, "Papi, don't let them take me away!" SMF 20.[1]  The undisputed facts here are that Plaintiffs were separated without any interview, investigation, or assessment of parentage.

Below is a picture of R.Y.M.R. in government custody shortly after he was separated from his father.



Ex. 47 at 020459.

Defendant contends that it has discretionary authority to separate children from their parents when there are doubts about parentage. But Defendant's claimed authority to investigate parentage is a red herring. Defendant concedes that its own policies and practices require it to investigate the family relationship, make an assessment, and have facts supporting its doubts

---

[1]   Citations to "SMF __" are to paragraphs of Plaintiffs' concurrently-filed Statement of Material Facts.

before it takes a child away, especially a child as young as three years old.  None of that happened here.

The undisputed facts show that no such investigation was done in connection with this family: the personnel identified by Defendant as having responsibility for this case, and the parentage determination, unequivocally denied any such responsibility and blamed each other for the lack of investigation.  The undisputed facts demonstrate that *no one* undertook *any* actual investigation or made *any* assessment.  Although there was no reason to separate R.Y.M.R and his father, R.Y.M.R. was shipped off a thousand miles away from his father for more than two months.

Defendant concedes that Plaintiffs are—in fact—father and son.  Indeed, Defendant was able to verify that fact soon after the separation, when, in the wake of media attention, Defendant contacted and consulted with the Honduran consulate.  The Honduran consulate, consistent with the identity documents that Plaintiffs were carrying, quickly confirmed the familial relationship between R.Y.M.R. and Mr. Matute.  That verification should have been done before, and not after, the separation.  By the time of this basic investigative step, it was too late:  R.Y.M.R. had already been separated from his father, and neither one knew for how long the separation would last.  Tellingly, an ICE supervisor admitted shortly after the separation that Plaintiffs had been "inadvertently separated" and that Defendant urgently needed to reunite the family.  SMF 100.  Yet R.Y.M.R. remained separated from his family for a total of 10 weeks with a foster family in Texas.  Even when he returned home, R.Y.M.R. would stand by the window of his house looking to see if men were coming to take him away from his family again.  SMF 105.  On the extraordinary and undisputed facts of this case, Plaintiffs are entitled to partial summary judgment.

## SCOPE OF PLAINTIFFS' MOTION

Plaintiffs' complaint raises four claims: negligence, Intentional Infliction of Emotional Distress ("IIED"), battery, and assault.  Plaintiffs do not seek summary judgment on their battery and assault claims.  On their negligence and IIED claims, Plaintiffs seek summary judgment only on liability, and acknowledge that the extent of the harm that the lengthy separation caused is disputed.  Plaintiffs believe that narrowing the issues to damages will substantially move this case forward, to trial or potential resolution.[2]

---

[2]   To the extent that California tort law requires a certain level of emotional harm to establish liability for negligence or IIED, Plaintiffs believe that issue is best addressed when damages are assessed given the dispute between the parties regarding harm.

# STATEMENT OF FACTS

A.    **Plaintiffs' Separation**

In fall 2017, Mr. Matute was threatened in Honduras by a man who had killed his aunt and cousin.  SMF 4.  Mr. Matute and R.Y.M.R. immediately fled to the United States.  *Id.*  They were apprehended by Customs and Border Protection ("CBP") on November 13, 2017, upon crossing the Southern border near San Diego, California, at which time Mr. Matute presented his Honduran national registration card and a Honduran birth certificate for both himself and his son, which CBP documented on their "I-213" arrest forms.  SMF 5-7.  CBP processed them as a "family unit" and transferred them to the San Diego Field Office of Immigration and Customs Enforcement ("ICE") the next afternoon.  SMF 8, 10.

On November 16, 2017, ICE officials told Mr. Matute that he would be separated from his son.  SMF 17, 19.  Mr. Matute was not told why his son would be taken away, for how long they would be apart, or where R.Y.M.R. would go.  SMF 17.  Shortly thereafter, ICE officials took the child from his father's arms as R.Y.M.R. screamed, "Papi, don't let them take me away!"  SMF 20.  R.Y.M.R. was sent to Health and Human Services' Office of Refugee Resettlement ("ORR"), which placed him with a foster family in San Antonio, Texas.  SMF 23.  Mr. Matute, meanwhile, was detained in an ICE facility near San Diego.  SMF 22, 49.  During his more than two-month detention, Mr. Matute never spoke to his son.  SMF 100-101.

In response to national media attention about the case, ICE headquarters asked ICE San Diego officials to review the case.  Accordingly, two days after the separation, a longtime ICE supervisor, Gladys Martinez, sent an email to ORR, among others, admitting that Mr. Matute and his son (as well as two other families) had been "inadvertently separated" and asking for assistance in "coordinating the reunification of the minors with their parents."  SMF 100.  Likewise, on the same day, ICE supervisor Michael Maresca emailed ICE Assistant Field Office Director ("AFOD") Mario Ortiz about Plaintiffs and the two other families that had been separated at the same time, saying that they were "trying to get the kids back to San Diego for reunification" with their fathers.  SMF 49.  AFOD Ortiz then gave an order to "suspend all [Family Unit] separations until further notice."  SMF 50-51.  The next day, Ms. Martinez followed up to stress the "urgency of this matter to reunify the juveniles with their parents."  SMF 100.  Ultimately, on November 22, Defendant took the obvious—yet belated—step of contacting the Honduran consulate, which confirmed Plaintiffs were father and son.  SMF 35.

Nonetheless, R.Y.M.R. remained in foster care in Texas for two more months—until January 29, 2018.  SMF 21, 23.  Instead of remedying its mistake by releasing Mr. Matute from ICE detention given his lack of criminal or immigration history, Defendant instead waited until January to reunite R.Y.M.R. with his mother, after she was finally able to make her way to the United States from Honduras.  SMF 24, 98, 102.  Mr. Matute was released from detention on January 19, 2018.  SMF 104.  Only then was he able to finally see his son, who had been like his father's "little shadow" in Honduras, following his father everywhere.  SMF 3.

**B.     R.Y.M.R. Was Taken from His Father Without *Any* Investigation**

The material facts about the process by which ICE San Diego separates families are not in dispute.  Defendant claims that it has lawful authority to separate an adult and child where there are doubts about parentage or when the child's safety is in danger, which Plaintiffs do not dispute as a general matter.  And even Defendant does not claim that it can simply assert that doubts exist and separate without any investigation or factual basis for such doubts, *i.e.*, that it can take a child away for any reason or no reason.

The unremarkable point that there must be an investigation prior to separation is memorialized in a September 2017 Standing Management Order by the ICE San Diego Field Office, issued two months before Plaintiffs' separation and operative at the time of the separation. SMF 88. That directive states that the AFOD shall make the final decision on separations but shall do so only after a Deportation Officer and/or Supervisor makes an "assessment" of the case and a "recommendation" to the AFOD on whether to separate.  SMF 88-90.  But here, there was neither an investigation ("assessment") of Plaintiffs' case nor a recommendation to the AFOD.  Even after years of discovery, Defendant still cannot provide a credible account of the investigation leading to Plaintiffs' separation.

Plaintiffs' interrogatories asked Defendant to identify all ICE employees "who were involved in or responsible for investigating, reviewing, or verifying" Plaintiffs' relationship. Defendant's response identified three people: (1) **Maria Chairez**, the Deportation Officer who "investigated the relationship"; (2) **Gladys Martinez**, the Supervisor who "reviewed facts of the case and made the separation recommendation"; and (3) **Mario Ortiz**, the AFOD who "approved the separation of the Plaintiffs."  SMF 36.  Discovery has now revealed that these statements are contradicted by the following undisputed facts about the supposed investigation and recommendation.

**Ms. Chairez** testified that she did not recall ever meeting Plaintiffs and that she had taken *no steps* to investigate their parent-child relationship. SMF 37-38. Indeed, Ms. Chairez claimed that it was not her role to conduct such investigations and that her supervisor (Ms. Martinez) had already decided to separate Plaintiffs before she was ever assigned the case. SMF 38, 43. Ms. Chairez further testified that Defendant's response to Plaintiffs' interrogatory was false, and that prior to her deposition, she had never been shown the interrogatory response. SMF 36.

**Ms. Martinez**, in turn, testified emphatically that she was "not involved" in the decision to separate Plaintiffs and denied that she "reviewed the facts of the case" or "made the separation recommendation." SMF 40. She in turn blamed Ms. Chairez for the inadvertent separation, stating that Ms. Chairez frequently took "short cuts" that resulted in mistakes. SMF 44. Like Ms. Chairez, Ms. Martinez also testified that Defendant's response to Plaintiffs' interrogatory was false, and that prior to her deposition, she had not read the interrogatory response. SMF36.

**Mr. Ortiz** similarly testified that he did not do any investigation of Plaintiffs' circumstances. SMF 42. Rather, he testified that, as AFOD, he would not do his own investigation, but would rely on his subordinates to communicate the relevant facts. SMF 70-71. But here, his relevant subordinates disclaimed having done any investigation on which he could have relied. *See* SMF 36-40, 45.

Defendant has not presented any other individual who claims to have investigated Plaintiffs' case or recommended their separation. *See* SMF 36. Had Defendant undertaken even a bare-bones investigation, Plaintiffs' separation could easily have been avoided. Had Defendant interviewed Plaintiffs, for instance, R.Y.M.R., at age three, would have been able to identify his father. *See* SMF 20, 82, 87. Likewise, had Defendant examined the documents Plaintiffs brought with them and presented to government officials, including R.Y.M.R.'s birth certificate, those documents would have identified the parental relationship. *See* SMF 7, 35, 54. And had Defendant contacted the consulate *before* the separation, any doubt about parentage would have been quickly resolved, just as it was when ICE eventually contacted the consulate *after* the separation. *See* SMF 28, 30. Yet the undisputed facts show that Defendant never interviewed the family, never contacted the consulate, and never sought to verify Plaintiffs' documents before separating this family. SMF 28-34. Instead, Defendant separated a three-year-old child from his father

notwithstanding the existence of various methods capable of dispelling whatever supposed doubts of parentage existed.  *See* SMF 18-20.[3]

### C.  Plaintiffs' Separation Was Based on a Single Incorrect Fact

According to Defendant, AFOD Ortiz approved the separation of Plaintiffs.  SMF 36.  But under the ICE San Diego Management Standing Order and practice in the office, the AFOD's approval should be based on "assessment" of the facts and a "recommendation" from a Deportation Officer and/or supervisor.  *See* SMF 89-91.  Here, however, no investigation by anyone (including Mr. Ortiz) was undertaken, nor was a recommendation made to him by a Deportation Officer or supervisor.  SMF 38, 40, 42-45.  And, in this case, that failure to follow policy and practice and obtain an assessment and recommendation from subordinates was especially problematic.  Indeed, at the time AFOD Ortiz allegedly authorized Plaintiffs' separation, he had been in his position for only a few days, had not received training regarding ICE San Diego's policies and procedures for separating families, and did not even know the circumstances under which children could be taken from their parents.  SMF 14-16.  Thus, on the day he approved Plaintiffs' separation, he had to ask two different times: "What is the criteria we use or take into account to separate?"  SMF 16; *see also* SMF 15.

In fact, the only pre-separation information that Mr. Ortiz received about Plaintiffs' case was in a cursory email from Deportation Officer Chairez that contained only one insufficient fact that was, in any event, incorrect.  The email stated: "Honduran family unit consist[s] of a male adult (age 33) and male minor (age 3).  I am unable to verify relationship as minor is too young to answer questions.  Requesting guidance to separate and detention for adult at [Otay Mesa Detention Center] and ORR placement for the minor."  SMF 12-13.

Ms. Chairez testified, however, that the email was not based on an investigation, was not intended to be a recommendation to separate Plaintiffs, and had been written only after her supervisor (Ms. Martinez) told her that Plaintiffs' separation had already been authorized (a fact

---

[3]   Defendant now claims that the investigation into parentage is based on the "totality of circumstances" and no one investigative technique is required.  SMF 70.  But given extensive testimony from ICE supervisors and Defendant's designated Rule 30(b)(6) witness, there is no dispute that the standard operating procedure in the San Diego office was to interview the family, examine all identity documents brought by the family, and, if necessary because doubts about parentage persisted, contact the consulate.  SMF 70-81.  Any disputes about whether particular investigative steps were required in every case are immaterial given that it is undisputed that Defendant took *no* steps here.

Ms. Martinez denies).  Ms. Chairez testified that she was writing simply to seek "guidance" and to "confirm" that the separation had previously been authorized, so she could proceed with what she viewed as her own job responsibility: "processing" the father for detention and the child for placement with the ORR.  SMF 43.  And because she had not interviewed the family or asked R.Y.M.R. *any* questions, she did not claim any independent basis for believing R.Y.M.R. was too young to verify that Mr. Matute was his father.  SMF 48.  To the contrary, Ms. Chairez emphatically testified that a three-year-old child *could* identify his own father.  SMF 82.

More generally, no other government witness claimed that a three-year-old child is too young to identify his own parent.  *See id.*  And because a three-year-old child obviously can identify his own parent, Defendant's supervisors and Rule 30(b)(6) witness stressed that they would therefore want to know the obvious if they received a conclusory email like Ms. Chairez's: whether the family was interviewed: whether the family was carrying documents; whether there was a reason to believe the documents were inauthentic; and whether the consulate was contacted if there were doubts about parentage. SMF 70, 74, 80.[4]

Notably, ICE itself apparently recognized that the limited information in Ms. Chairez's email was insufficient to warrant separating a three-year-old child from his father.  In light of the media attention, ICE engaged in post-hoc efforts to justify Plaintiffs' separation and requested that Ms. Chairez submit a synopsis in memorandum form to the San Diego Field Office Director Gregory Archambeault.  SMF 55-56.  The memorandum was requested and first drafted in December of 2017, nearly one month *after* Plaintiffs' separation.  SMF 56-57.  Later drafts are undated.  SMF 61.  Yet the purported "purpose of this memorandum is to request authorization for separations of the . . . family units."  SMF 58.  No ICE witness could explain why a memo was written to "request authorization" to separate Plaintiffs a month after they had already been separated or why the date of the memo was deleted during the drafting process.  SMF 59.  And instead of stating only that the child was too young to identify his father (the extent of the information in Ms. Chairez's pre-separation email), the memo added that the consulate had been

---

[4]   Obviously, the fact that a child *is* too young to speak would not be a basis on its own for taking the child away from his parent, as Defendant's witnesses uniformly testified.  SMF 84-85. Otherwise all babies would be taken away from their parents.  Instead, ICE must simply use alternative means of verifying parentage, *e.g.*, examining documents or contacting the consulate.  SMF 74-75.

contacted, without stating that the consulate had been contacted only *after* the separation.  SMF 59-60.[5]

### D.      Systemic ICE San Diego Issues

Other evidence underscores the errors committed by Defendant in Plaintiffs' case.  Not only were two other families "inadvertently separated" on the same day as Plaintiffs, SMF 100, but between October and early December 2017, *100 percent* of ICE separations *nationwide* based on supposed doubts about parentage were undertaken by the San Diego ICE office.  SMF 93.  That is so despite the fact that the San Diego ICE and CBP offices collectively had less than 13 percent of the nationwide total of border apprehensions of family units.  *Id.*  The Court need not resolve any broader issues about the San Diego office's practices, but these startling facts reinforce Supervisor Martinez's testimony that "short cuts" were being taken in the ICE San Diego office in 2017.

**LEGAL STANDARD**

Summary judgment may be granted if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue of fact is genuine only if the evidence in the record would allow a reasonable jury to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under the governing law.  *Id.* at 248.  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting *Anderson*, 477 U.S. at 251); *Latele Television, C.A. v. Telemundo Comm. Grp., LLC*, No. 12-cv-22539, 2015 WL 427817, at *4 (S.D. Fla. Feb. 2, 2015).

---

[5]     The memo also acknowledged that Plaintiffs had documents with them when they arrived (a fact not noted in Ms. Chairez's email to AFOD Ortiz), but claimed that the documents were copies, apparently suggesting that that fact warranted separation.  SMF 60.  Plaintiffs dispute that the documents were copies, SMF 7, but the dispute is immaterial.  As several supervisors and Defendant's Rule 30(b)(6) witness testified, the fact that a migrant only has copies (but not originals) of his documents is not a reason, by itself, to separate a family.  SMF 86.  Instead, if the circumstances of the case, including the nature of the documents, give rise to any doubt, the consulate should be contacted prior to making a decision whether to separate.  SMF 31, 75-78.  But in this case, the consulate was not contacted until Defendant separated Plaintiffs.  SMF 33-35

## ARGUMENT

I.    **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR NEGLIGENCE CLAIM**

To establish negligence, Plaintiffs must show that "[D]efendant had a duty to use due care," that Defendant "breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Brown v. USA Taekwondo*, 483 P.3d 159, 164 (Cal. 2021) (citation omitted). The undisputed facts show that Defendant breached the duty of care it owed to Plaintiffs.

A.    **Defendant Owed Plaintiffs a Heightened Duty of Care**

"[W]hether a defendant owes a duty of care is a question of law." *Burgess v. Superior Ct.*, 831 P.2d 1197, 1200 (Cal. 1992) (en banc) (citation omitted).   A duty of care may "exist by virtue of a special relationship." *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 807 (Cal. 1993). In California, where the separation occurred, "'there is a special relationship between jailer and prisoner, imposing on the former a duty of care to the latter.'" *Lawson v. Superior Ct.*, 180 Cal. App. 4th 1372, 1389-90 (2010) (citing *Giraldo v. Cal. Dep't of Corrs. & Rehab.*, 168 Cal. App. 4th 231, 250 (2008)).   The jailer-prisoner relationship "is the epitome of a special relationship," because prisoners are vulnerable and dependent on the jailer.   *Giraldo*, 168 Cal. App. 4th at 250-51).   Because of this special relationship, California law "imposes a *heightened* duty of care on jailers, due to prisoners' increased vulnerability while incarcerated." *Edison v. United States*, 822 F.3d 510, 521 (9th Cir. 2016) (emphasis added) ("That the United States had a duty to protect Plaintiffs is further bolstered by California's recognition of a special relationship between jailers and prisoners.").

This is likewise true in the immigration context, as other cases involving family separation have held.   *C.M. v. United States*, No. 19-cv-05217, 2020 WL 1698191, at *2 (D. Ariz. Mar. 30, 2020) (finding, under Arizona law, that "[f]ederal immigration officials too, are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care"); *A.F.P. v. United States*, No. 21-cv-00780, 2022 WL 2704570, at *10 (E.D. Cal. July 12, 2022) (applying Texas law to find that "[f]ederal immigration officials, like employees at a private facility for the mentally impaired tasked with the care and custody of facility residents, also have a 'special relationship' with detainees").

There is no dispute that Defendant took Plaintiffs into custody upon their arrival in the United States, SMF 5-6, 10, "imposing on the former a duty of care to the latter." *Giraldo*, 168 Cal. App. 4th at 250; *see also Lawson*, 180 Cal. App. 4th at 1389-90.   Accordingly, Defendant

owed not only a duty of care—but a heightened duty of care—to Plaintiffs while they were in custody. *See Edison*, 822 F.3d at 521 (recognizing California "imposes a *heightened* duty of care on jailers, due to prisoners' increased vulnerability while incarcerated.") (emphasis added).

**B.    Defendant Breached Its Heightened Duty of Care to Plaintiffs**

"Jailers must exercise reasonable and ordinary care for the life and health of [the] prisoner." *Giraldo*, 168 Cal. App. 4th at 249 (citations omitted).  Ordinary care is "that degree of care which people of ordinarily prudent behavior can be reasonably expected to exercise under the circumstances of a given case." *Hilyar v. Union Ice Co.*, 45 Cal. 2d 30, 36 (1955).  And "it is ordinarily necessary to exercise greater care for the protection and safety of young children." *Conroy v. Perez*, 64 Cal. App. 2d 217, 224 (1963).

The undisputed facts here show that Defendant failed to exercise even a minimal level of care before separating Plaintiffs.  Defendant's officers and employees have argued that they assess whether a family relationship exists based on the "totality of the circumstances," that there are a variety of investigative techniques used by the San Diego ICE office, that no one step is required in every investigation, and that the investigation into parentage may take various forms depending on the particulars of the case.  SMF 70.  The record shows unmistakably that ICE policy and procedure were to interview families, examine documents, and, if necessary, contact the consulate to resolve any doubts about parentage.  SMF 66-75.  In any event, whether ICE was required to take each of these particular steps, or any other investigative steps, is ultimately immaterial, because Defendant conducted no investigation at all.  SMF 30-35.  And wholesale failure to undertake any investigation prior to separating a young child from his father certainly breaches Defendant's duty of care owed to Plaintiffs.  Indeed, the only two individuals identified by Defendant as having "investigated" Plaintiffs' case (Ms. Chairez) and "recommended" separation (Ms. Martinez), SMF 36, both empathically denied doing so, and testified that Defendant's interrogatory response on these facts, which they had never seen, was simply wrong.  SMF 37-40. In short, Defendant did not interview the family, examine the documents the family presented, or contact the consulate.  Only after the media called attention to the separation of young children, including R.Y.M.R., from their parents did Defendant finally go to the consulate and confirm that Plaintiffs were indeed father and son.  SMF 35, 46.  Defendant's neglect is inexcusable, especially where a three-year-old child is involved.

Nor can Defendant take refuge by pointing to Ms. Chairez's November 15, 2017 email to AFOD Ortiz seeking guidance on whether to separate Plaintiffs based on R.Y.M.R. being "too young to answer questions." SMF 60. As noted, Ms. Chairez expressly denied having investigated the family, could not recall even meeting Plaintiffs, and further denied that it was her job to investigate parental relationships. SMF 37-38. Ms. Chairez additionally testified that the email was written only after her supervisor (Ms. Martinez) told her that Plaintiffs' separation had already been authorized, SMF 43 (a statement Ms. Martinez denies, SMF 44), and that she was writing simply to "confirm" that fact so she could proceed with processing the father for detention and the child for placement with ORR. SMF 43. And because she had not interviewed the family herself, it plainly was not her personal view that the child was too young to verify that Mr. Matute was his father. SMF 38. Moreover, Ms. Chairez emphatically testified that a three-year-old child was old enough to identify his own father, SMF 82, leaving no doubt that she did not actually undertake any investigation of this family.

Similarly, Defendant cannot excuse its conduct by pointing to the fact that AFOD Ortiz made the final decision to separate this family, SMF 36, given that Ms. Chairez's email supplied him with only one insufficient and incorrect fact (that R.Y.M.R. was too young to identify his father), SMF 48; that as an AFOD he did not do his own investigation into the relevant facts to make up for the lack of an investigation and recommendation by a Deportation Officer and supervisor, SMF 42; and that he had been in the AFOD position for only a few days, had not received training on separations, and did not even know the "criteria" for separating a family on the day he was asked to approve Plaintiffs' separation, SMF 14-16. And he quickly suspended separations upon hearing a few days later that the separation of Plaintiffs and two other families had been mistaken. SMF 50-53.

That the San Diego ICE office was responsible for 100 percent of all separations nationwide based on supposed doubts about parentage, SMF 93, and that Defendant stopped separations of families in the wake of R.Y.M.R.'s separation, and attempted to retroactively justify the separations in a memorandum to Field Office Director Archambeault, SMF 60, only underscore how negligent Defendant's actions were. Partial summary judgment is thus warranted on the issues of whether Defendant had a duty of care to Plaintiffs and breached that duty.

## II.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR IIED CLAIM

Under California law, to recover for IIED, a plaintiff must show "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (Cal. 2009).[6]

The undisputed facts show that Defendant's decision to separate R.Y.M.R. from his father—without any factual basis—was extreme and outrageous, and that Defendant's intentional failure to conduct *any* investigation into the parental relationship between R.Y.M.R. and his father was done with reckless disregard of the nearly certain consequences of separating a three-year-old child from his father for unknown duration. Having shown "that there is no genuine dispute as to any material fact," Plaintiffs are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A.     Defendant's Conduct Was Extreme and Outrageous.

Conduct is outrageous when "it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Hughes*, 46 Cal. 4th at 1051; *see also* Restatement (Second) of Torts § 46 (Am. L. Inst. 1965). In determining whether conduct is outrageous, courts consider whether the defendant "(1) abuse[d] a relation or position which [gave] him power to damage the plaintiff's interest; (2) kn[ew] the plaintiff [was] susceptible to injuries through mental distress; or (3) act[ed] intentionally or unreasonably with the recognition that the acts [were] likely to result in illness through mental distress." *Agarwal v. Johnson*, 25 Cal. 3d 932, 946 (Cal. 1979), *disapproved on other grounds*, *White v. Ultramar, Inc*., 603 P.2d 58, 25-27 (Cal. 1999)).

There are "few acts more calculated to engender a sense of outrage in both the victim and the average member of the community" than separating a young child from his or her parent. *Pankratz* v. *Willis*, 744 P.2d 1182, 1189 (Ct. App. Ariz. 1987) (collecting cases). As such, courts consistently hold that separating a child from one's parents—or even attempting to do so—qualifies as extreme and outrageous conduct for purposes of an IIED claim. *See, e.g.*, *Turnbull v. United States*, No. 1:06CV858, 2007 WL 2153279, at *9 (N.D. Ohio July 23, 2007) (ICE's unlawful deportation which caused Plaintiff to be "separated from his family, certainly rise[s] to

---

[6]     As noted, Plaintiffs do not seek summary judgment on prongs two and three, because Defendant disputes the extent of the emotional harm caused to Plaintiffs by Defendant's separation of the family.

the level of 'outrageous'" conduct for purposes of IIED claim); *Kunz v. Deitch*, 660 F. Supp. 679, 684 (N.D. Ill. 1987) (being "deprived of all contact with [one's] infant daughter" is "adequate to sustain [a] claim" of IIED); *Sheltra v. Smith*, 392 A.2d 431, 433 (Vt. 1978) (holding that "rendering it impossible for any personal contact or other communication to take place between the Plaintiff and her daughter . . . establish[ed] the prima facie case [of] outrageous conduct"); *Kajtazi v. Kajtazi*, 488 F. Supp. 15, 20 (E.D.N.Y. 1978) ("It is difficult to conceive of intentional conduct more calculated to cause severe emotional distress than the outrageous conduct" of separating infant from his mother.).

In *Weisman* v. *County of Los Angeles*, No. CV 12–10207 SJO (CWx), 2013 WL 12202779 (C.D. Cal. Sept. 5, 2013), the plaintiff alleged that the defendant made "false allegations in juvenile court proceedings in order to remove his son from his custody." *Id.* at *9. In rejecting the defendant's argument that the conduct was not extreme or outrageous, the court found that where the defendant was "tasked with protecting a child," its attempt to "manufacture and present false evidence to the juvenile court in order to separate that child from his parents" was of a type that sufficed to meet the outrageousness requirement of IIED. *Id.* at *10. Similarly, in *Holden v. Target Corp.*, No. 16-cv-02217, 2016 WL 3938950 (N.D. Cal. July 21, 2016), a store employee who suspected plaintiff of shoplifting then "abused his position of power" and "attempted to separate [plaintiff] from her children." *Id.* at *4. The court held that an incident which included the employees "threaten[ing] the well-being of her family members" by "saying that [Child Protective Services] was going to take [her] children" was "extreme and outrageous." *Id.*

The behavior here was extreme and outrageous. The undisputed evidence shows that Defendant unreasonably and recklessly failed to conduct *any* investigation to verify Plaintiffs' relationship. SMF 28-30, 38, 40, 42. The conduct here was even worse than in *Holden*. Defendant did not merely threaten to take R.Y.M.R. Defendant *actually separated* Mr. Matute from his child for more than two months, and never told him when, if ever, he would see his child again. SMF 17. If a mere threat to do something is extreme and outrageous, not only threatening but then following through on that threat is all the more extreme and outrageous. And just like in *Weisman*, where the county employee was alleged to have proffered false testimony for the purpose of separating a family, Defendant separated Plaintiffs based on the false claim that R.Y.M.R. was too young to answer questions—when the investigating officer had never even tried to speak to him. SMF 13, 37, 39, 41, 48.

Making Defendant's conduct all the more extreme and outrageous was its position of power over Plaintiffs and R.Y.M.R.'s young age. As a jailer, ICE had "a special relationship" with Plaintiffs because Mr. Matute and his son were vulnerable and dependent on the jailer. *Giraldo*, 168 Cal. App. 4th at 250-51; *supra* 9-10. These are the sorts of relationships that California law finds more likely to give rise to outrageous and extreme conduct. *See McDaniel*, 230 Cal. App. 3d at 373. When in ICE custody, R.Y.M.R. was just a three-year-old child who was undoubtedly terrified and could hardly comprehend the prospect that he was to be separated from his father for a period of months. SMF 1, 20. This conduct is extreme and outrageous.

For these reasons, courts around the country have condemned such separations as "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *Ms. L. v. U.S. Immig. and Customs Enforcement*, 310 F. Supp. 3d 1133, 1145-46 (S.D. Cal. 2018); *see, e.g.*, *W.S.R.* v. *Sessions*, 318 F. Supp. 3d 1116, 1126 (N.D. Ill. 2018) ("[T]he government's insistence on keeping these boys from their fathers can only be deemed arbitrary and conscience shocking."). And courts are not the only ones: "member[s] of the community" have been shouting "outrageous!" about this conduct since it first became public. *Crouch*, 39 Cal. App. at 1007 (internal citation and quotation omitted). The American Academy of Pediatrics has called separating children from their parents "child abuse" and Physicians for Human Rights has said that family separation amounts to "torture."[7] One does not need a medical degree to understand the outrageousness of separating children from their parents. *See* SMF 94-95 (President Biden: family separations are "a human tragedy"; Secretary Mayorkas: child separation is "unconscionable"; Attorney General Garland: I "can't imagine anything worse than tearing parents from their children"). On this, there can be no dispute.

## B.     Defendant Acted with Reckless Disregard of the Probability that Plaintiffs Would Suffer Emotional Distress.

The intent requirement for IIED can be satisfied by showing the defendant (1) "acted intending to inflict the injury," (2) "with the realization that the injury was substantially certain to result from [the] conduct," or (3) "act[ed] recklessly in disregard of the likelihood that [the

---

[7]   *Pediatric Doctor Says Separating Families at Border Is "a Form of Child Abuse,"* CBS News (June 18, 2018), available at https://www.cbsnews.com/news/doctor-colleen-kraft-separating-families-at-border-form-of-child-abuse/; Physicians for Hum. Rts., *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation* at 27 (Feb. 2020), available at https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf.

defendant] will cause emotional distress to the plaintiff." *Katsaris* v. *Cook*, 180 Cal. App. 3d 256, 268 (Cal. Ct. App. 1986). "Reckless disregard can, like any other specific intent, be proven circumstantially by inference from the conduct of the actor." *Id.* It is enough that Defendant "devoted little or no thought" to the near certainty that its conduct would cause severe emotional distress. *KOVR-TV, Inc.* v. *Superior Ct.*, 31 Cal. App. 4th 1023, 1031-32 (Ct. App. 1995).

Here, it is apparent that ICE officers either acted "with the realization that the injury was substantially certain to result" or recklessly disregarded those likely consequences. *Katsaris*, 180 Cal. App. 3d at 268. The factual record makes clear that ICE was aware that separating minors and family units could result in real harm to both child and parent. SMF 96. ICE policy and directives thus make clear the special vulnerabilities that young children possess. SMF 74 (requiring ICE Officers to treat minors with "dignity, respect, and with special concern due to vulnerabilities").

ICE's post-separation actions, moreover, made clear that its officers were aware of the likely consequences of unnecessary child separations. Shortly after realizing the separation had been inadvertent, Ms. Martinez admitted ICE's mistake, stressing the "urgency of this matter to reunify the juveniles with their parents." SMF 100. Such a reunification could be urgent only because of the harm that a short separation—let alone one lasting more than two months—would likely cause the child and parent. Similarly, Mr. Ortiz, the Assistant Field Office Director, gave an order to "suspend all [Family Unit] separations until further notice," SMF 50-51, not wanting to inflict this harm on other families.

Defendant can hardly claim that it or its officers were unaware that harm was substantially certain to flow from pulling a three-year-old child from his father's arms and keeping them separated for more than two months. In any event, such a lack of awareness could be caused only by a reckless disregard of the facts.

## III.   THE FEDERAL TORT CLAIMS ACT WAIVES DEFENDANT'S SOVEREIGN IMMUNITY

The FTCA waives Defendant's sovereign immunity in certain tort suits by providing that the "United States shall be liable [for torts] . . . in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Plaintiffs' negligence and IIED claims fall squarely within that waiver and no exceptions apply here.

### A.     The Discretionary Function Exception Does Not Apply Here

The FTCA's discretionary function exception ("DFE") does not apply here because Defendant lacked the discretion to separate Plaintiffs without investigating and attempting to verify R.Y.M.R.'s relationship with Mr. Matute.  And Defendant certainly cannot carry its burden to prove that the failure to do any investigation of Plaintiffs was based on any policy rationales, much less of the kind that the FTCA intended to shield.

The DFE exempts the federal government from liability when the claim is based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  For the DFE to apply, Defendant's tortious conduct must both (i) involve an element of judgment or choice, *and* (ii) be based on considerations of public policy "of the kind" that the exception was designed to shield.  *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991); *Douglas v. United States*, 814 F.3d 1268, 1273 (11th Cir. 2016).  Defendant cannot satisfy either *Gaubert* prong because it failed to conduct even the most basic investigation of parentage before separating Plaintiffs.

### 1.     ICE Lacked Discretion to Engage in No Investigation

Defendant cannot satisfy *Gaubert*'s first prong because it is undisputed that Defendant had a basic obligation to conduct *some* investigation before taking the grave step of separating a father from a son.  Yet at every turn, ICE violated its own policies and procedures by failing to conduct any investigation of Plaintiffs' relationship before making the decision to separate them.[8]

In *Sakal v. United States*, the court held that where agency policy and practice required employees to inspect and maintain the park's ramps and report any hazardous conditions, the government's failure to properly maintain the park premises and warn visitors of hazards was not

---

[8]  Under *Shivers v. United States*, 1 F.4th 924 (11th Cir. 2021), constitutional violations do not automatically overcome the DFE.  *Id.* at 930-35.  But, here, Plaintiffs assert that Defendant cannot assert the DFE because it violated ICE San Diego's own written policies, as well as unwritten procedures. For the purposes of the DFE, courts broadly interpret what constitutes internal agency policies.  As the Supreme Court recognized, because "[n]ot all agencies issue comprehensive regulations . . . an agency may rely on internal guidelines rather than on published regulations."  *Gaubert*, 499 U.S. at 324; *Sakal v. United States*, No. 09-cv-21933, 2010 WL 3782138, at *3 (S.D. Fla. Sept. 28, 2010) (holding in FTCA case that the government's policy consisted of both written and unwritten mandates in addition to the regular practices of park employees).  Here, there is both written policy and unwritten procedure.

discretionary.  2010 WL 3782138, at *3.  Similarly, in *Perkins v. United States*, the court found that the "official policy and the unwritten policy and practice of employees," as well as its training of mail carriers, provided a fixed, ascertainable mandate regarding the location where carriers should leave packages.  339 F. Supp. 3d 1309, 1313 (S.D. Fla. 2018).  Thus, the discretionary function exception did not bar recovery.  *Id.*

As discussed above, there is overwhelming evidence that Defendant's written and unwritten policies required some investigation prior to taking a child away from his or her parent. *See* SMF 28-29, 69, 80, 88-91.  The September 2017 Standing Order required an "assessment" and "recommendation."  SMF 88-91.  Moreover, Defendant's own witnesses testified that the standard practice was that some level of investigation was of course required because separating a parent from a child is a serious action and inflicts serious harm on the family.  SMF 70-81.  Nor could Defendant plausibly dispute that it must do some investigation and have a fact-based reason for the separation.  Indeed, it would be beyond reckless if Defendant had no policy and practice requiring an investigation and was simply taking children away from their parents without a factual basis.

The discretionary function test provides no defense under these facts.  Whether or not particular investigative steps were required, some investigation was required.  *See, e.g.*, *Appley Bros. v. United States*, 164 F.3d 1164, 1173 (8th Cir. 1999) (even if specific investigative steps were not required "the USDA inspector had no discretion to make an independent policy judgment as to whether he should check on the status"); *Fleming v. United States*, 69 F. Supp. 2d 837, 841 (W.D. Va. 1999) (discretionary function exception did not bar recovery where mine inspectors failed to inspect mine).  The Eleventh Circuit has recognized analogous rules in other contexts; for example, in *Miles v. Naval Aviation Museum Foundation, Inc*., the court rejected a discretionary function defense at *Gaubert*'s first prong because government regulations required that the government use "trained, certified mechanics" to perform certain tests of aircraft, and the government's failure to do so led to negligent inspections.  289 F.3d 715, 721 (11th Cir. 2002).

### 2.  No Policy Rationale Shields the Failure to Conduct an Investigation

Even assuming Defendant had some level of discretion not to engage in any investigation at all (which it did not), any DFE defense would fail at *Gaubert*'s second prong because the failure to forego any investigation at all is not the "kind" of decision the discretionary function exception was designed to protect.  The inquiry is not about the employees' subjective intent, but rather

whether the nature of the actions taken is susceptible to policy analysis. *Gaubert*, 499 U.S. at 324-25. The defendant has the burden of production "of the policy considerations that might influence the challenged conduct." *Ochran v. United States*, 117 F.3d 495, 504 n.4 (11th Cir. 1997).

Defendant's failure to investigate the supposed doubts about Plaintiffs' relationship before taking a three-year-old child away from his father could not possibly be based on any legitimate policy considerations.

The Eleventh Circuit's decision in *Swafford v. United States*, 839 F.3d 1365 (11th Cir. 2016), is instructive. There, the court held that even if decisions about how to supervise a government contractor's maintenance of a campground might be discretionary, "choosing to accept a dangerously unsafe stairway" was not within a range of permissible policy choices. *Id.* at 1370-72 (cleaned up). Other courts have similarly made clear that "an absent-minded or lazy failure" to conduct inspections or "notify appropriate authorities" of problems do not "involve considerations of public policy." *Coulthurst v. United States*, 214 F.3d 106, 111 (2d Cir. 2000) (cleaned up). Where, as here, "the Government is aware of a specific risk and responding to that risk would only require the Government to take garden-variety remedial steps, the discretionary function exception does not apply." *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 338 (3d Cir. 2012); *see also Indian Towing Co. v. United States*, 350 U.S. 61, 68-69 (1955) (finding that inadequate maintenance of a lighthouse triggers liability under the FTCA); *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195-96 (9th Cir.1987) (finding that the Park Service's failure to maintain a road was not subject to the DFE).

Notably, this Court has rejected application of the DFE in a case alleging that ICE officers erroneously initiated removal proceedings against a United States citizen after conducting a negligent investigation. *Creedle v. Miami-Dade Cnty.*, No. 17-CIV-22477, 2019 WL 5212420, at *9-10 (S.D. Fla. June 14, 2019) (Williams, J.). In *Creedle*, the government argued that the process of investigating and determining whether a person was a citizen was a discretionary function and that the decision about how to manage resources for conducting that investigation was susceptible to a policy analysis. *See* Defendant United States of America's Motion to Dismiss Second Amended Complaint for Damages, *Creedle v. Miami-Dade Cnty.*, No. 17-CIV-22477 (March 12, 2019). This Court refused to dismiss on that basis. *Creedle*, 2019 WL 5212420, at *9-10.

In short, had ICE conducted even the most cursory investigation, as its policies and procedures required, ICE would have concluded that Mr. Matute was R.Y.M.R.'s father. Such a finding would have prevented Plaintiffs' over two-month-long separation. SMF 21. No ICE official had the discretion to disregard ICE's policies or procedures or to unilaterally determine that no investigation was necessary prior to separating a three-year-old child from his father. That utter failure did not reflect "an element of judgment and choice"; it was simply a failure to undertake even the most basic investigative steps. The discretionary function exception provides no defense in such a context.

**B.      The Due Care Exception Does Not Apply Here.**

The due care exception bars "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). The due care exception applies where "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow . . . as long as the employee has exercised due care in following the dictates of the statute or regulation." *Crumpton v. Stone*, 59 F.3d 1400, 1403 (D.C. Cir. 1995) (quotation omitted).

The due care exception does not bar Plaintiffs' claims, as this Court previously concluded. MTD Hearing Tr. 52:17-53:11 (Feb. 5, 2021). Discovery has only strengthened the basis for that conclusion. First, Defendant has identified no statute or regulation that specifically required Plaintiffs' separation. *See* SMF 24-27; *see also A.PF. v. United States*, 492 F. Supp. 3d. 989, 996 (D. Ariz. 2020) (concluding that due care exception did not apply where Plaintiffs challenged family separations not "conducted . . . pursuant to any statute or regulation").

Second, Defendant's officers did not exercise due care. Due care for the purposes of § 2680(a) "implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956). Here, Defendant "inadvertently" separated Plaintiffs based on purported doubts about parentage without conducting any investigation into Plaintiffs' relationship. SMF 28-44, 53, 100. Accordingly, Defendant's officers did not act with due care. *See C.M. v. United States*, No. 5:21-CV-0234, 2023 WL 3261612, at *22-*23 (W.D. Tex. May 4, 2023) (concluding that the government failed to act with due care where it separated a father and son and took no steps to reunite the family); *A.E.S.E. v. United States*, No. 21-cv-0569 RB-GBW, 2022 WL 4289930, at *14 (D.N.M. Sept. 16, 2022) (holding that the government failed to act with

due care where it forcibly removed a daughter from her father, refused to give the father information about his daughter's whereabouts, and needlessly prolonged the daughter's detention).

**C.   Plaintiffs' Tort Claims Satisfy the Broad Private Analogue Inquiry.**

To fall within the FTCA's waiver of sovereign immunity, the claim asserted against the government must have an analogue to a claim that could be asserted against a private party.  As this Court has already recognized in denying Defendant's motion to dismiss, the private analogue requirement is a generous one.  MTD Hearing Tr. 54:4-11 (citing *Indian Towing*, 350 U.S. 61). That there is no private analogue to immigration is of no moment: the Supreme Court has repeatedly held that the government can be liable for activities over which the federal government has exclusive authority.  *United States v. Olson*, 546 U.S. 43, 46-47 (2005) (finding private analogue requirement satisfied in context of mining inspections conducted only by the government).  California law provides for tort liability for the improper separation of a child from one's parent.  *Surina v. Lucey*, 168 Cal. App. 3d 539, 542-43 (Ct. App. 1985).  Furthermore, California law gives significant weight to a "parent's interest in the companionship, care, custody and management of [one's] children," finding it to be "ranked among the most basic of civil rights."  *In re Marilyn H.*, 5 Cal. 4th 295, 306 (Cal. 1993).  The private analogue requirement is clearly satisfied here.

**CONCLUSION**

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment.

Dated: June 30, 2023

_/s/ Ian M. Ross_
Ian M. Ross (Fla. Bar No. 091214)
Carmen M. Ortega-Rivero (Fla. Bar No. 1025996)
SIDLEY AUSTIN LLP
1001 Brickell Bay, Suite 900
Miami, FL 33131
Tel.: (305) 391-5100
Fax: (305) 391-5101
_iross@sidley.com_
_cortegarivero@sidley.com_

Lee Gelernt*
Daniel A. Galindo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
Tel.: (212) 549-2660
Fax: (212) 549-2654
_lgelernt@aclu.org_
_dgalindo@aclu.org_

Stephen B. Kang*
Hannah Schoen*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-1198
Fax: (415) 395-0950
_skang@aclu.org_
_hschoen@aclu.org_
_osarabia@aclu.org_

Katherine Holloway Blankenship (Fla. Bar No. 1031234)
ACLU FOUNDATION OF FLORIDA
4343 West Flagler Street Suite 400
Coral Gables, Florida 33134
Tel.: (615) 796-9027
kblankenship@aclufl.org

Robert Parks (Fla. Bar No. 61436)
300 Sevilla Avenue, Suite 206
Coral Gables, FL 33134
Tel: (305) 445-4430
Fax: (305) 445-4431
_bob@garaylawfirm.com_

21

Alexander A. Reinert*
55 Fifth Avenue, Room 1005
New York, NY 10003
Tel:  (646) 592-6543
*areinert@yu.edu*

Geoffrey R. Chepiga*
Hallie S. Goldblatt*
Jacqueline P. Rubin*
Steven C. Herzog*
Jing Yan*
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel:  (212) 373-3000
*gchepiga@paulweiss.com*
*hgoldblatt@paulweiss.com*
*jrubin@paulweiss.com*
*sherzog@paulweiss.com*
*jyan@paulweiss.com*

Andrew J. Topal*
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street NW
Washington, DC 20006
Tel:  (202) 223-7300
*atopal@paulweiss.com*


*Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| ERIC MATUTE CASTRO, on his own behalf and as the representative of his minor son, R.Y.M.R., | Case No. 1:20-cv-23598-KMW-EGT |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiffs' Motion for Partial Summary Judgment was served via the U.S. District Court for the Southern District of Florida's electronic filing system on June 30, 2023, on counsel for Defendant United States of America.  Service via the Court's electronic filing system is permitted under Federal Rule of Civil Procedure 5(b)(2)(E) and S.D. Fla. Local Rule 5.1(e).

Dated: June 30, 2023

_/s/ Ian M. Ross_
Ian M. Ross (Fla. Bar No. 091214)
SIDLEY AUSTIN LLP
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131
Tel.:  (305) 391-5100
Fax:  (305) 391-5101
*iross@sidley.com*